928 F.2d 920
 Raymon J. MELTON, Plaintiff-Appellee/Cross-Appellant,
v.
CITY OF OKLAHOMA CITY, a municipal corporation; Lloyd A. Gramling, Chief of Police for the City of Oklahoma City; Gerald L. Emmett, Assistant Chief of Police for the City of Oklahoma City; Marvin Maxwell, Major, Oklahoma City Police Department; William R. Chambless, Major, Oklahoma City Police Department; Carl Smith, Lieutenant, Oklahoma City Police Department; Robert Taylor, Lieutenant, Oklahoma City Police Department; David McBride, Lieutenant, Oklahoma City Police Department; and Paula Hearn, Assistant to
the City Manager, Defendants-Appellants/Cross-Appellees.
 Nos. 85-1738 to 85-1742 and 85-1811.
 United States Court of Appeals,
Tenth Circuit.
 March 19, 1991.
 
 Steven M. Angel, Oklahoma City, Okl., for plaintiff-appellee/cross-appellant.
 Richard C. Smith (James G. Hamill, Diane Lewis, Gerald S. Rakes, and Jonathan D. Woods, with him on the briefs), Oklahoma City, Okl., for defendants-appellants/cross-appellees.
 Diane Pedicord, Oklahoma City, Okl., on the brief, for amicus curiae Oklahoma Mun. League, Inc.
 HOLLOWAY, Chief Judge,* and McKAY, LOGAN, SEYMOUR, MOORE, ANDERSON, TACHA, BALDOCK, BRORBY, and EBEL, Circuit Judges.
 OPINION ON REHEARING EN BANC
 JOHN P. MOORE, Circuit Judge.
 
 
 1
 Plaintiff Raymon J. Melton brought this action under 42 U.S.C. Secs. 1983 and 1985. Among the causes he asserted was a claim that he was deprived of a liberty interest by the defendants without due process when he was discharged from his job as a police officer in Oklahoma City, Oklahoma. Following a plaintiff's verdict, the defendants appealed, and a portion of the judgment was reversed. Melton v. City of Oklahoma City, 879 F.2d 706 (10th Cir.1989). We granted rehearing en banc to resolve certain issues relating to plaintiff's liberty interest claim. Melton v. City of Oklahoma City, 888 F.2d 724 (10th Cir.1989). Although we denominated four issues for argument, we believe disposition of the first moots the remainder. We now conclude the trial court committed plain error in the submission of the liberty interest claim to the jury, and we reverse. The remaining issues decided by the panel stand as determined.
 
 I.
 
 2
 Prior to his termination, Mr. Melton was a lieutenant in the Oklahoma City Police Department. During his tenure, he became a friend of William C. Page, a former state court judge who was indicted by a federal grand jury on felony charges. In preparation for the trial of Mr. Page, the federal prosecutor interviewed Mr. Melton. For reasons of his own, Mr. Melton surreptitiously recorded his conversation with the prosecutor and later gave the recording to counsel for Mr. Page.
 
 
 3
 The recording was used by Mr. Page's attorney as the basis for a motion to dismiss the indictment on the ground that Mr. Melton had provided the prosecutor with information to which the defense was entitled under Brady v. State of Maryland, 373 U.S. 83, 87, 83 S.Ct. 1194, 1196, 10 L.Ed.2d 215 (1963). The motion was denied, and Mr. Page was subsequently convicted.
 
 
 4
 Following the trial, Agent Ed Enwright, the agent in charge of the Oklahoma City office of the Federal Bureau of Investigation, advised defendant Lloyd A. Gramling, Chief of Police, of a complaint against Mr. Melton. Mr. Enwright accused Mr. Melton of improperly disclosing the details of his conversation with the federal prosecutor and of perjuring himself in an affidavit and during trial.
 
 
 5
 In response, Chief Gramling ordered a police department investigation of the accusations. On August 1, 1983, defendant Lt. Carl Smith, the head of the Internal Affairs Bureau, commenced the investigation by interviewing Mr. Enwright, who directed Lt. Smith to Agent Ron West. Lt. Smith spoke to Agent West from whom Lt. Smith obtained details of Mr. Melton's tape recorded conversation. Mr. Enwright also told Lt. Smith he did not know the details of the alleged perjury, but Lt. Smith could obtain the facts from a third agent, Mr. Fitzpatrick.
 
 
 6
 After his interviews of Agents Enwright and West, but before contacting Agent Fitzpatrick, Lt. Smith prepared and delivered to Mr. Melton a document dated August 17, 1983. According to Lt. Smith, the only purpose of the document was to "inform Lt. Melton what he had been accused of by the F.B.I. and that I was conducting, on the instructions of the Chief's office, an investigation of him on those allegations." (R. Vol. XII, 676).[1] Referring to those allegations, Lt. Smith wrote Mr. Melton was "accused of violating the Police Code of Ethics[2] ... [and] making perjured statements both in a sworn affidavit ... and during testimony ... during the trial."
 
 
 7
 When he interviewed Agent Fitzpatrick, Lt. Smith discovered there was no substance to Agent West's claim Mr. Melton had perjured himself. Agent West had told Lt. Smith that Mr. Melton had testified during the Page trial he had turned over to the FBI certain evidence in the Page case that was not pursued by the FBI. Agent West also told Lt. Smith following a search subsequent to Mr. Melton's testimony, no formal record of Mr. Melton's evidence was found by the FBI. Agent West said, therefore, unless Mr. Melton had given the information to Agent Fitzpatrick, Mr. Melton's testimony was untrue. When Lt. Smith interviewed Agent Fitzpatrick, he stated Mr. Melton made several attempts to provide him with information, and if Mr. Melton said he furnished him with the evidence "then he probably did." (Ex. 61, Report dated September 6, 1983, at 2).
 
 
 8
 Lt. Smith then filed his report of the investigation (Ex. 61) with Chief Gramling on September 6, 1983. The report made no recommendations, reached no conclusions, but described the substance of the interviews of various witnesses.
 
 
 9
 On September 8, 1983, Mr. Melton was notified that five days later a hearing would be convened by a police department disciplinary review board (the Board) to consider the Internal Affairs investigation. On that same day, two stories which are the genesis of the plaintiff's liberty interest claim, appeared in Oklahoma City newspapers.
 
 
 10
 Prior to the appearance of the stories, a reporter from The Daily Oklahoma called defendant Lt. David McBride, the police department's public information officer, seeking confirmation of the pending investigation. (R.V. XII, 604-06). Lt. McBride testified the reporter:
 
 
 11
 read me a story that he had about information that he had received by [sic] sources that he did not reveal, that the police department was investigating R.J. Melton.
 
 
 12
 And he articulated several things that he, through his sources, had learned, that Melton was--well, I think that answers your question....
 
 
 13
 ....
 
 
 14
 I didn't take notes of his interview. Okay. He was calling to tell me here's what I've got. What's the police department's position on this. The information he had, that Melton allegedly perjured himself at a--during a trial, the trial of Judge William Page.
 
 
 15
 He said that he had information that the police department was investigating Melton for tape recording an interview with the federal prosecutor.
 
 
 16
 ....
 
 
 17
 And what I tried to do was minimize that as much as possible, tell them that--confirm those things that there was investigation in progress, that to my knowledge there were no immediate charges of a criminal nature being considered.
 
 
 18
 ....
 
 
 19
 We corrected some information. Some of the information that [the reporter] had was far more damaging, in my mind, than the story that actually ran. It was incredible. I was quite alarmed that some of the information he had was inaccurate and was very damaging to ... Mr. Melton....
 
 
 20
 (R.V. XII, 603-06). This conversation and a "follow-up" (R.V. XII, 607) ultimately led to the publication of two stories.
 
 
 21
 It is undisputed that both stories reported the Internal Affairs investigation of Mr. Melton and the hearing that was set for that day. In addition to statements taken from Lt. McBride, the Daily Oklahoman quoted "other knowledgeable sources" who stated Mr. Melton "is being investigated, among other things, for purportedly committing perjury during Page's trial." Nothing within the Daily Oklahoman article attributes to Lt. McBride any disclosure of the FBI perjury accusation. Indeed, the bulk of information contained in the story, including that accusation, was attributed to "sources," "informed sources," or "other knowledgeable sources." The article in the Oklahoma City Times attributed statements to Michael Gassaway, "one of Page's attorneys," and Lt. McBride. That article stated:
 
 
 22
 McBride said the department's internal affairs division also investigated allegations Melton perjured himself when he testified in Page's behalf during Page's trial.
 
 
 23
 ....
 
 
 24
 The internal affairs findings will go before a disciplinary review board at 9 a.m. Tuesday. The board will decide whether Melton's actions violated departmental policies or ethical cannons, McBride said.
 
 
 25
 He said the board will recommend to Chief Lloyd Gramling what action, if any, he should take against Melton.
 
 
 26
 ....
 
 
 27
 McBride said the internal affairs investigation did not establish whether Melton perjured himself.
 
 
 28
 "It's not the responsibility of internal affairs to draw conclusions," McBride said. "It's their responsibility to report the facts as they find them to be from the investigation."
 
 
 29
 "The investigative report would only reflect, 'Here's what the facts were: here's what Lt. Melton said.' "
 
 
 30
 McBride said he does not know what specific parts of Melton's testimony are alleged to be perjurious.[3]
 
 
 31
 To report the internal affairs review's findings on the alleged perjury would be to try and convict Melton in the press before the review board has reached a conclusion, he said.[4]
 
 
 32
 Both stories contain accurate representations of Lt. McBride's responses to the questions of the reporters.
 
 
 33
 When the Board was convened, the chairperson, defendant Chief Emmett, told the members that the charge of perjury "was out, that we would not consider that under any circumstances. There will be no discussion of that whatsoever." (R.V. VII, 10).[5] At the outset of the hearing, Mr. Melton was told by Chief Emmett the Board would not consider the perjury accusation. (R.V. X, 145). According to plaintiff, "This was the first that I really knew that I was being boarded just for the police Code of Ethics." Id.
 
 
 34
 Following the hearing, the Board, with one member dissenting, concluded Mr. Melton had violated the Code of Ethics by recording and disclosing to Mr. Page's counsel the contents of Mr. Melton's conversation with the federal prosecutor. Two members of the Board consequently recommended Mr. Melton be demoted, but the remainder recommended discharge. Chief Gramling carried out the recommendation of the majority.
 
 
 35
 In response to media inquiry, Lt. McBride subsequently confirmed in a published statement that Mr. Melton had been discharged for violating the police Code of Ethics. No media account carried information about the resolution of the FBI's perjury accusation, but on cross-examination, Lt. McBride was asked:
 
 
 36
 Q: And you never made it a matter of public record that he was--that the charges were unfounded, sustained, not sustained, he was cleared, whatever the language of those policies are. You never made that a matter of public record, did you, sir?
 
 
 37
 A: Yes, I did.
 
 
 38
 Q: You did?
 
 
 39
 A: Yes, sir.
 
 
 40
 Q: And who did you tell?
 
 
 41
 A: To several radio stations also. [sic]
 
 
 42
 Q: Who?
 
 
 43
 A: Who?
 
 
 44
 Q: Tell us.
 
 
 45
 A: I don't recall everybody.
 
 
 46
 Q: Just tell us one.
 
 
 47
 A: Just one? I'm sure that whoever covered that story. And I know KEBC covered it. I don't know who all else covered that story, but there were questions asked about the perjury allegation. And my response was those charges were found not to be, not to have happened, that it was a misunderstanding.
 
 
 48
 I recall specifically talking to several members of the press about that.
 
 
 49
 (R.V. XII, 621). This testimony was not controverted.
 
 II.
 
 50
 The issue now before us stems from Mr. Melton's argument that the publication of the two stories quoting Lt. McBride and others which revealed the accusations of perjury made by the FBI resulted in the denial of a liberty interest because Mr. Melton was not provided a hearing to clear himself of that accusation.[6] The particular issue we granted rehearing to address is whether the district court committed plain error by instructing the jury that a liberty interest may be violated by charges which "would stigmatize the employee's reputation or foreclose future employment opportunities." Order Granting Rehearing, 888 F.2d at 724. We now believe that question cannot be answered without first determining whether the two articles upon which the claim is based are stigmatizing.[7]
 
 
 51
 To place our consideration of the issue in proper perspective, however, we must review the nature of the liberty interest now claimed by Mr. Melton. The seminal issue we shall resolve in this review is whether a plaintiff asserting such a claim must prove both stigmatization and loss of prospective employment opportunity.
 
 
 52
 Relying on language from Miller v. City of Mission, Kan., 705 F.2d 368 (10th Cir.1983),[8] the district court instructed the jury that for plaintiff to prevail on his liberty interest claim he must prove that his termination was accompanied by public dissemination of the "charges" against him, and that "the reasons for his dismissal would stigmatize his good name, reputation, honor and integrity, or foreclose further employment opportunities."[9] (emphasis added). We now question this instruction on two grounds. First, was it proper to allow the jury to consider the issues of stigmatization and deprivation of employment opportunities in the disjunctive; and, second, did the trial court err by allowing the jury to consider whether the statements relied upon by plaintiff were stigmatizing without an independent review of that issue by the court?[10]
 
 
 53
 The solution to our questions is contained in a line of cases beginning with Board of Regents v. Roth, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). In that case, reviewing the constitutional guarantees of liberty and property in the context of public employment, the Supreme Court elaborated upon the elements of "stigmatization" in charges leading to dismissal, id. at 573, 92 S.Ct. at 2707, and foreclosure of the employee's "freedom to take advantage of other employment opportunities." Id. Holding the Regents (State) had not taken action against Mr. Roth that would implicate his liberty interest, the Court stated:
 
 
 54
 The State, in declining to rehire the respondent, did not make any charge against him that might seriously damage his standing and associations in his community. It did not base the nonrenewal of his contract on a charge, for example, that he had been guilty of dishonesty, or immorality. Had it done so, this would be a different case. For "[w]here a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him, notice and an opportunity to be heard are essential". (citations omitted). In such a case, due process would accord an opportunity to refute the charge....
 
 
 55
 Similarly, there is no suggestion that the State, in declining to re-employ the respondent, imposed on him a stigma or other disability that foreclosed his freedom to take advantage of other employment opportunities. The State, for example, did not invoke any regulations to bar the respondent from all other public employment in state universities. Had it done so, this, again, would be a different case. For "[t]o be deprived not only of present government employment but of future opportunity for it certainly is no small injury...."
 
 
 56
 Id. at 573-74, 92 S.Ct. at 2707 (citations omitted).
 
 
 57
 In succeeding cases, the Court brought Roth into sharper focus. First, in Paul v. Davis, 424 U.S. 693, 710, 96 S.Ct. 1155, 1164, 47 L.Ed.2d 405 (1976), the court stated Roth did not hold that defamation of a public employee alone is enough to violate a protected liberty interest. Additionally, the Court explained, to be actionable, the defamation must occur in the course of the termination of employment. Id. Second, the stigmatizing statement must be disclosed publicly. Bishop v. Wood, 426 U.S. 341, 348, 96 S.Ct. 2074, 2079, 48 L.Ed.2d 684 (1976). Third, the stigmatizing statement must be false. Codd v. Velger, 429 U.S. 624, 97 S.Ct. 882, 51 L.Ed.2d 92 (1977). Indeed, "there must be some factual dispute between an employer and a discharged employee which has some significant bearing on the employee's reputation." Id. at 627, 97 S.Ct. at 884.
 
 
 58
 Putting these cases together, we can construct the parameters of a liberty interest case involving the discharge of a public employee. When a public employer takes action to terminate an employee based upon a public statement of unfounded charges of dishonesty or immorality that might seriously damage the employee's standing or associations in the community and foreclose the employee's freedom to take advantage of future employment opportunities, a claim for relief is created. That construction of the claim leads us to the conclusion the trial court erred in instructing the jury on the nature of the liberty interest asserted in this case.[11]
 
 
 59
 Because the court disjoined the aspects of stigmatization and foreclosure of opportunity, the jury was permitted to find for the plaintiff on grounds that he was foreclosed from future employment opportunities without also finding he had been stigmatized. As a result, the plaintiff was permitted to recover a substantial verdict without carrying the entire burden of proof placed upon him. We believe the instruction constituted plain error because the dichotomy created in the instruction between stigmatization and future employment opportunity is patently wrong. Moreover, when the improper instruction is coupled with the absence of stigmatization, which we shall discuss in part III, the consequences of the error are simply unjust and prejudicial. The factors of the incorrect instruction and the results produced, working together, create plain error. Zimmerman v. First Fed. Sav. & Loan Ass'n, 848 F.2d 1047, 1054 (10th Cir.1988).
 
 III.
 A.
 
 60
 We now turn to the question whether the statements made by Lt. McBride to the Oklahoma City Times were stigmatizing. We undertake this determination in accordance with the directives set out in Bose Corp. v. Consumers Union of United States, Inc., 466 U.S. 485, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984). Bose involved a claim of commercial disparagement in which the question of whether the defendant made a false statement with actual malice was an issue on appeal. In its review, the Court initially recognized the conflict of two established principles. The first is that the finding of malice is subject to the clearly erroneous test of Fed.R.Civ.P. 52(a). The second, as the Court noted in New York Times Co. v. Sullivan, 376 U.S. 254, 284-86, 84 S.Ct. 710, 728-29, 11 L.Ed.2d 686 (1964), is that in cases raising First Amendment issues, an appellate court has an obligation to make an independent review of the record to insure against "forbidden" intrusion on free expression. Bose, 466 U.S. at 499, 508, 104 S.Ct. at 1958, 1963. While embracing the notion that deference is to be accorded to a trial court's finding of fact, the Court nonetheless stated, when findings are intertwined with legal principles, the appellate court's duty to correct errors in law is not inhibited by Rule 52(a). Indeed, the Court explained:
 
 
 61
 A finding of fact in some cases is inseparable from the principles through which it was deduced. At some point, the reasoning by which a fact is "found" crosses the line between application of those ordinary principles of logic and common experience which are ordinarily entrusted to the finder of fact into the realm of a legal rule upon which the reviewing court must exercise its own independent judgment. Where the line is drawn varies according to the nature of the substantive law at issue. Regarding certain largely factual questions in some areas of the law, the stakes--in terms of impact on future cases and future conduct--are too great to entrust them finally to the judgment of the trier of fact.
 
 
 62
 Id. at 501, n. 17, 104 S.Ct. at 1960, n. 17.
 
 
 63
 We believe the question of stigmatization before us must fall into this realm because it implicates many of the Court's concerns over the fact-finding process of the First Amendment. As in New York Times v. Sullivan and Bose, the finding of stigmatization intersects First Amendment principles and defamation law. Whether Lt. McBride's report of the FBI accusations stigmatized Mr. Melton evokes the same conflict between the common law of defamation and First Amendment principles as the trial court's finding of actual malice and free speech in Bose. 466 U.S. at 502-03, 104 S.Ct. at 1960. We therefore follow the mandate of Bose and make an independent review of the record on the dispositive constitutional issue. Milkovich v. Lorain Journal Co., --- U.S. ----, 110 S.Ct. 2695, 2705, 111 L.Ed.2d 1 (1990).
 
 
 64
 The basis for Mr. Melton's claim is the assertion Lt. McBride publicized reports that Mr. Melton perjured himself. Were the facts that simple, the case would have a different focus, but the simplification, in this instance, leads to a distortion which unjustly controls the outcome. To permit the distortion to stand, therefore, is wrong.
 
 
 65
 There are many controlling factors overlooked in the plaintiff's claim. First, Lt. McBride was not alone responsible for the publication. The evidence is undisputed that the first reporter who contacted him already knew about the FBI's accusations. Unfortunately, the source of that information was not disclosed, but we do know the original disclosure of the accusation did not come from Lt. McBride.[12] Second, the published stories themselves attribute disclosure of the defamatory reports to persons other than Lt. McBride. More importantly, the disclosure of the perjury accusation contained in The Daily Oklahoman story came in quotes from the spectral informants, not from Lt. McBride. Third, all the statements made by Lt. McBride were true. Mr. Melton was accused by the FBI of having committed perjury, and the Oklahoma City Police Department was investigating that accusation. Fairly read in context, there is nothing contained in either publication which suggests Lt. McBride or any other defendant either accepted the accusation as true or embraced it as his own.
 
 
 66
 Fourth, the plaintiff was never charged with perjury by the Chief of Police, and the punitive action taken against Mr. Melton had nothing to do with the FBI's accusation. Indeed, even before the punitive action against him went beyond the initial investigative stage, the defendants had decided the accusation was without substance. In fact, the issue of the perjury accusation would not have arisen at all during the disciplinary process without the disclosures made by those "other sources" to the press. Moreover, Mr. Melton was never, and could never have been, called upon to defend himself against the FBI's accusation because that accusation was not an issue. Indeed, Mr. Melton admitted he knew at the hearing he was only charged with violation of the Code of Ethics.
 
 
 67
 Of the circumstances obscured in plaintiff's claim, two are most critical. First, the statements attributed to Lt. McBride and published in the Oklahoma City press are deprived of any stigmatization by Codd because nothing Lt. McBride reported was false. Moreover, even though Lt. McBride reported the unfounded accusations of the FBI, there is no evidence that he did so maliciously, recklessly, or with any harmful intent. Neither is there any evidence that he adopted those accusations as his own or as those of the Oklahoma City Police Department. Second, the defendants did not "charge" Mr. Melton with having perjured himself.[13]
 
 B.
 
 68
 Codd does not establish a hardbound rule that truth is a complete defense to every liberty interest claim of the nature asserted by Mr. Melton. Yet, we believe, in instances such as this case, where there is no evidence of duplicity behind truthful reports, Codd exonerates the person making the report.[14] To determine whether a report is truthful, however, the court must view a publication in its entirety. We reach this conclusion from the direction taken by the Supreme Court in cases involving the conflict between the right of free speech and charges of defamation. In Milkovich, 110 S.Ct. 2695, the Court's own review of those cases led the Court to strongly imply that whether a publication is defaming is not to be determined from a single sentence, but rather from the content of a complete statement. In Milkovich, the plaintiff brought a state court action for defamation contending an article authored by the defendant contained a false accusation that plaintiff had committed an act of perjury. Analyzing the publication, the Court stated:
 
 
 69
 The dispositive question in the present case then becomes whether or not a reasonable factfinder could conclude that the statements in the [publication] imply an assertion that petitioner Milkovich perjured himself in a judicial proceeding. We think this question must be answered in the affirmative. As the Ohio Supreme Court itself observed, "the clear impact in some nine sentences and a caption is that [Milkovich] 'lied at the hearing after ... having given his solemn oath to tell the truth.' " (citation omitted). This is not the sort of loose, figurative or hyperbolic language which would negate the impression that the writer was seriously maintaining petitioner committed the crime of perjury. Nor does the general tenor of the article negate this impression.
 
 
 70
 Id. at 2707. We believe this analysis requires us to view the sentence in the Oklahoma City Times in which Lt. McBride reported the FBI accusation in the context of the entire article. When we do this, we perceive that Lt. McBride neither accepted the FBI accusation as true, nor did he, himself, accuse Mr. Melton of perjury. Nor can it be presumed a reasonable reader would believe from the content of the article that either Lt. McBride or the other defendants had accused Mr. Melton of perjury. Furthermore, because the only disclosures contained in the article in The Daily Oklahoman which refer to the perjury accusations are attributed to "other knowledgeable sources" and not Lt. McBride, a fair reading of that article in no way implicates any of the defendants with the so-called stigmatizing statements.[15]
 
 C.
 
 71
 Of equal importance is the fact that Mr. Melton was not "charged" by the defendants with conduct which implicated his morality, honesty, or integrity. Plaintiff contends that the mere reporting of the FBI accusation constituted an actionable "charge," but we do not agree.
 
 
 72
 We believe a distinction must be drawn between the mere reporting of a claim made by someone and the adoption of that claim as a basis for punitive action against a public employee. We also believe the Supreme Court's use of the word "charge" in those cases from which the liberty interest claim has evolved is neither inadvertent nor insignificant.
 
 
 73
 Indeed, the genesis of the liberty interest claim is action taken by a public employer against a public employee. In Owen v. City of Independence, Mo., 445 U.S. 622, 634 n. 13, 100 S.Ct. 1398, 1407 n. 13, 63 L.Ed.2d 673 (1980), the Court, commenting upon Roth, stated:
 
 
 74
 [W]e explained that the dismissal of a government employee accompanied by a "charge against him that might seriously damage his standing and associations in his community" would qualify as something "the government is doing to him," so as to trigger the due process right to a hearing at which the employee could refute the charges and publicly clear his name.
 
 
 75
 This explanation makes clear that a "charge" is simply another way of referring to "something the government is doing [to the public employee]." The reverse of this construct is that if the government does nothing to the employee, the employee has no grounds for a liberty interest claim. For that reason, the Court concluded stigmatization without a punitive action against a public employee will not violate a protected liberty interest. Paul v. Davis, 424 U.S. at 710, 96 S.Ct. at 1164. Thus, we conclude that to qualify as a "charge" within the context of Roth, a stigmatizing statement must be the basis of punitive action taken by a public entity against one of its employees.
 
 
 76
 Because the defendants in this case took no action against Mr. Melton that was even impliedly the product of the false accusation of perjury, there was no "charge" of perjury made by the defendants. Neither was there an issue involved in the disciplinary process that would have permitted Mr. Melton a vehicle to clear his name of that accusation. Without such an issue, Codd implies the liberty interest name-clearing hearing is not required. There, the Court stated:
 
 
 77
 [I]f the hearing mandated by the Due Process Clause is to serve any useful purpose, there must be some factual dispute between an employer and a discharged employee which has some significant bearing on the employee's reputation.
 
 
 78
 429 U.S. at 627, 97 S.Ct. at 884. In this case, there was no factual dispute between Mr. Melton and the defendants over the question of perjury. Indeed, the evidence is quite clear the defendants concluded at an early stage of the proceeding that the accusation arose from a "misunderstanding." It is a simple fact that the FBI accusation was neither considered relevant by the defendants in their decision to discipline Mr. Melton, nor a reason for his dismissal.
 
 
 79
 As we noted in Miller, "[w]hen the termination [of a public employee] is accompanied by public dissemination of the reasons for dismissal, and those reasons would stigmatize" the employee, the concept of liberty is implicated. 705 F.2d at 373. Without either a factual dispute over the accusations or an adoption of those accusations as "the reasons for dismissal," a name-clearing hearing would have been without significance.
 
 
 80
 We must, therefore, conclude that the mere reporting of the defamatory accusations of a third party will not make governmental agencies or governmental officials liable for the deprivation of a protected liberty interest. That conclusion does not hold, however, if the governmental entity overtly or impliedly adopts those defamatory accusations as the basis for punitive action against an employee.
 
 
 81
 We made this conclusion plain in McGhee v. Draper, 564 F.2d 902 (10th Cir.1977). In that case, a teacher was not retained by the school board. Prior to the board's decision, however, the teacher had been made the subject of public accusations of allegedly immoral conduct. Those accusations were aired at a public hearing of the board and were the subject of comments by a board member. Unfortunately, those accusations were unfounded. Following the hearing, without explanation, the board decided not to renew the teacher's contract. There being no evidence that the board eschewed the unfounded accusations, it is clearly inferable that a significant reason for its decision was the board's adoption of the accusation the teacher was guilty of immoral conduct.[16] We therefore held the evidence supported a claim for deprivation of a protected liberty interest. In this case, however, the evidence is completely contrary to the inference that the unfounded accusations played any part in Mr. Melton's discipline. Additionally, in McGhee, there is no dispute that the employer disseminated the defamatory accusations. We said, "The Superintendent said about 200 copies of the minutes [containing the accusations] were duplicated and that 'we put them out to the public.' " McGhee, 564 F.2d at 910. Despite the notions of the dissent, McGhee is so factually distinguishable from this case that it is inapposite.
 
 
 82
 In structuring the parameters of constitutional guarantees, we must be mindful that our zeal for the protection of individual right does not lead us to absurd conclusions. To hold here that the defendants were required to provide Mr. Melton with a hearing to clear his name from accusations neither made nor adopted by these defendants, or as seemingly suggested by the dissent, a name-clearing news conference, would be just such an absurdity.
 
 
 83
 That portion of the judgment of the district court entered in favor of plaintiff on his liberty interest claim is VACATED. The case is REMANDED with instruction to enter judgment for the defendants on that claim.
 
 
 84
 LOGAN, Circuit Judge, with whom McKAY and SEYMOUR, Circuit Judges, join, dissenting:
 
 
 85
 This court granted en banc review limited to four issues which arise in liberty interest claims in an employment context, as follows:
 
 
 86
 "(1) Whether the district court committed plain error in instructing the jury that a liberty interest may be violated by charges which 'would stigmatize the employee's reputation or foreclose future employment opportunities'?
 
 
 87
 (2) Whether the district court committed plain error in failing to instruct the jury that before a liberty interest may be infringed, the charges must be found to be false?
 
 
 88
 (3) Whether the plaintiff was entitled to a name-clearing hearing complete with the right to confront and cross-examine witnesses before the disciplinary review board, assuming dissemination of the perjury charges deprived plaintiff of a liberty interest?
 
 
 89
 (4) Further assuming plaintiff is entitled to some sort of a hearing, need it be pre-termination, or would some post-termination hearing or name-clearing opportunity be adequate?"
 
 
 90
 Melton v. City of Oklahoma City, 888 F.2d 724, 725 (10th Cir.1989). We intended to clear up confusion arising out of our prior decisions for the benefit of the district courts and future panels of this court. The majority opinion, however, reverses the panel opinion and the judgment below on the basis of an issue never discussed in either the majority or the dissenting panel opinion, see Melton v. City of Oklahoma City, 879 F.2d 706 (10th Cir.1989), or briefed or argued in the en banc rehearing.
 
 
 91
 The majority perceives an injustice to the defendants and is determined to remedy that injustice, despite the fact doing so prevents the en banc court from reaching many of the problems it intended to resolve. Folklore has it that one of the ancients on our court once declared, "When this court starts out to do justice, all Hell can't stop it!" I wish I could agree that the majority does justice in the case before us.
 
 
 92
 * A
 
 
 93
 Insofar as the court determines that the "stigmatization - or - foreclosure - of - future - employment" instruction was erroneous, I agree. Although the majority uses "and" in its statement of the proper rule, the opinion does not hold that the terminated employee must prove both stigmatization and foreclosure of future employment. I would give the district courts more guidance on this issue, however, than does the majority.
 
 
 94
 Parsing the relevant statements in the United States Supreme Court cases I am satisfied that "stigmatization" sufficient to warrant recovery occurs when a charge might "seriously" damage the discharged employee's community standing and associations--e.g., dishonesty or immorality. Board of Regents v. Roth, 408 U.S. 564, 573, 92 S.Ct. 2701, 2707, 33 L.Ed.2d 548 (1972). While Roth also mentions charges that put the employee's "good name, reputation, honor, or integrity" at stake, id., clearly it is speaking in terms of a high level stigma that might affect future employment opportunities. See Paul v. Davis, 424 U.S. 693, 697, 96 S.Ct. 1155, 1158, 47 L.Ed.2d 405 (1976); Bishop v. Wood, 426 U.S. 341, 348, 96 S.Ct. 2074, 2079, 48 L.Ed.2d 684 (1976); Codd v. Velger, 429 U.S. 624, 630, 97 S.Ct. 882, 885, 51 L.Ed.2d 92 (Brennan, J., dissenting) (1977), id. at 633, 637-38, 97 S.Ct. at 887, 889 (Stevens, J., dissenting); Owen v. City of Independence, 445 U.S. 622, 661-62, 100 S.Ct. 1398, 1420-21, 63 L.Ed.2d 673 (Powell, J., dissenting) (1980) (The pivotal question after Roth is whether the charges "so blackened the employee's name as to impair his liberty interest in his professional reputation."). Charges are not stigmatizing enough to rise to a constitutionally protected liberty interest unless they involve allegations of dishonesty, immorality, or unprofessional or illegal conduct of the type that would be expected to seriously diminish employment opportunities. Charges of poor job performance, negligence, tardiness, or even insubordination, would not rise to the level of a violation of a protected liberty interest.[1]
 
 
 95
 I believe a fair implication from the Supreme Court decisions is that the discharged employee does not have to prove that he tried and was unable to get a job. I would overrule Conaway v. Smith, 853 F.2d 789, 794 (10th Cir.1988); Ewers v. Board of County Comm'rs, 802 F.2d 1242, 1249 (10th Cir.1986), cert. denied, 484 U.S. 1008, 108 S.Ct. 704, 98 L.Ed.2d 655 (1988), reh'd on other grounds, 874 F.2d 736 (10th Cir.1989); Sipes v. United States, 744 F.2d 1418, 1422 (10th Cir.1984), and any other of our cases to the extent they may be read to impose a requirement that a plaintiff must recite an actual frustrated job search to warrant relief. The Roth dicta indicates that if an employer invoked a rule prohibiting a discharged employee's employment by any state institution or participated in a "blackball" practice with other employers, this would constitute an alternative ground for relief.
 
 B
 
 96
 In cases with undisputed facts, I agree with the majority that the court must decide whether the statements made were sufficiently stigmatizing to implicate a liberty interest. Supreme Court decisions appear to treat the question whether the statements were sufficiently stigmatizing to violate a liberty interest as an issue of law for the court to determine. This approach seems implicit in the Roth Court's statement that mere nonretention of a nontenured professor does not amount to a deprivation of liberty, although it no doubt would foreclose some employment opportunities. 408 U.S. at 574 n. 13, 92 S.Ct. at 2707 n. 13. See also Bishop, 426 U.S. at 347-48, 96 S.Ct. at 2079. In Codd the Court appeared ready to decide for itself whether a report was stigmatizing, had it been alleged to have been false. 429 U.S. at 626, 97 S.Ct. at 883. See also Owen, 445 U.S. at 633 n. 13, 100 S.Ct. at 1406 n. 13. In most of the lower court decisions I have examined the courts have determined for themselves whether allegedly false charges rose to the level of a "liberty" interest; and when reviewing a decision in which a jury found a liberty interest was violated the appellate courts have given no apparent deference to the jury's determination on this issue.
 
 
 97
 Thus, I agree that the district court erroneously held that the allegedly false charges arose to the liberty interest level if they stigmatized the employee's reputation "or" foreclosed future employment opportunities. The first half of the instruction is a correct statement of the law, but the second half as written would permit recovery for foreclosure of future employment opportunities without establishing stigmatization. Unless the employer is somehow engaged in blackballing the employee, foreclosure of employment opportunity without proof of stigmatization is not actionable. Because the relevant facts in the instant case were undisputed, and only the inferences and legal conclusions to be drawn from those facts were in issue, I agree with the majority that the court also erred in submitting the stigmatization issue to the jury. Unlike the majority, however, I would find the error was harmless because the jury found for Melton and the district court, had it determined the issue as a matter of law, should have concluded that defendants were sufficiently responsible for dissemination of stigmatizing charges to support Melton's claim for damages.
 
 
 98
 The majority's bottom line is that defendants merely responded to information dug up by the media, that they did not make untrue statements--"Melton was accused by the FBI of having committed perjury, and the Oklahoma City Police Department was investigating," at 928; and the punitive action against Melton "had nothing to do with the FBI's accusation." Id. I believe this is too simplistic.
 
 
 99
 The majority states some facts differently and omits others that I think are relevant and important to our resolution of this issue. The letter Lt. Carl Smith gave Melton concerning the investigation he was conducting for the Oklahoma City Police Department stated, "You are ... accused of making perjured statements both in a sworn affidavit on a motion to dismiss filed by defense counsel, and during testimony you gave from the witness stand during the trial." Pl. exh. 48. The police department operations manual number 9.01 states expressly that complaints of misconduct by a police department employee, "whether from a private citizen or from another employee, will be fully investigated and the results reported to both the complainant and the accused employee." Pl. exh. 53. When the investigation is complete, that manual requires a finding of one of four designations: "unfounded," "exonerated," "not sustained," or "sustained." Id. Melton was interviewed and a full investigation was made, with a formal written report by Lt. Smith delivered to the internal affairs unit. The Disciplinary Review Board considered the report; the perjury issue was on its hearing agenda. The Board recommended Melton's termination but made no finding with respect to the perjury charge. See pl. exh. 61. Melton was never given an opportunity before the board to address the perjury charges.
 
 
 100
 Quoting "knowledgeable sources," the Daily Oklahoman published an article on September 8 stating that Melton was "being investigated, among other things, for purportedly committing perjury during Page's trial." Pl. exh. 49. Although this article focused primarily on the fact that Melton had given a tape recording of his conversation with a prosecutor to defense counsel for Judge Page, it mentioned that "[p]rosecutors attempted to prove that Melton regularly shared confidential investigative information with Page, who then allegedly shared the information with underworld figures." Id. In its recital of the Oklahoma City Times article of an interview with Lt. David McBride, which discussed the police department's internal investigation of Melton, the majority opinion leaves out the following:
 
 
 101
 "McBride said it was unusual for the internal affairs division to investigate the perjury allegation.
 
 
 102
 'Normally, alleged criminal violations don't go through the internal affairs division,' he said. 'But since there already was an internal affairs investigation about specific policy violations, the federal prosecutors chose to go ahead and let us do that.' "
 
 
 103
 Pl. exh. 50.
 
 
 104
 The following day the Times had an editorial commending the police administration for investigating Melton and another officer who testified on behalf of Judge Page. It recited that the other officer had resigned while under investigation for "allegedly fraternizing with known criminals." Pl. exh. 52. It then stated, "Melton, a 20-year police veteran, is being investigated for possible violations of police conduct guidelines stemming from an active role in helping prepare Page's defense." Id. After Melton was fired, the Sunday Oklahoman carried an article on officers who had been dismissed from the Oklahoma City police force "who have been suspected of or found guilty in some wrongdoing...." pl. exh. 62, X R. 279-80. The article mentioned only that Melton had been terminated for violating the police department's code of ethics. There was direct testimony, however, that the law enforcement community believed that Melton was discharged for perjury as well as cooperation with Page's defense counsel. See X R. 227 (testimony of Larry Van Shuyver).
 
 
 105
 There is no magic in the source of stigmatizing charges if the employer either adopts them or furthers their stigmatizing effect. No doubt quite often they originate with others such as the FBI, or even in rumors and gossip. See, e.g., Eames v. City of Logan, 762 F.2d 83, 84 (10th Cir.1985) ("rumors of criminal misconduct"); McGhee v. Draper, 564 F.2d 902, 904 (10th Cir.1977) (McGhee I ) ("rumors and gossip in the community"); Lyons v. Barrett, 851 F.2d 406, 408 (D.C.Cir.1988) (another employee's accusations of sexual misconduct and misuse of government telephones). In each of the cases cited immediately above the liberty interest became an issue because of public knowledge of the allegations, and because the employer investigated the charges and then discharged the employee; in none of them did the employer give as a reason for discharge that it found the charges to be true. Rather, the employer gave either no reason or a different reason for the employee's termination. Nevertheless, the confluence of stigmatizing rumors or accusations in public circulation, combined with investigation and discharge created a public impression that the discharge was related to the charges. Accordingly, the employer was held to have a duty to give a name clearing hearing. This circuit recognized in McGhee v. Draper, 639 F.2d 639 (10th Cir.1981) (McGhee II ), that the employer need not explicitly state stigmatizing factors, but may "implicitly ratify some other stigmatizing allegations. Thus, the dismissal will either cause or contribute to the alleged defamation." Id. at 643 (emphasis added). See also Wulf v. City of Wichita, 883 F.2d 842, 869 n. 35 (10th Cir.1989).
 
 
 106
 The reasoning of other courts confirms that a liberty interest violation may occur although an employer's tendered reasons for dismissing an employee do not include an explicit accusation of any wrongdoing. It is enough that the employer's actions create an impression that is stigmatizing. For example, in Fraternal Order of Police v. Tucker, 868 F.2d 74 (3d Cir.1989), the Third Circuit stated:
 
 
 107
 "When a police department announces to the media that it has information sufficient to occasion an investigation of on-duty drug use, that in this context the officer under investigation refused urinalysis, and that the Department considered the overall situation such as to warrant dismissal, other law enforcement agencies are unlikely to consider the officer for other employment because, at least without more information than that reported, they will conclude that the officer is more likely than not guilty as charged. Accordingly, if the plaintiffs had alleged and proved in this case that they had not used drugs behind the Cobb Creek Park tennis courts or that they had substantial evidence to tender at a hearing in support of such an allegation, they, at least arguably, would have made out a stigmatization case under the Due Process Clause."
 
 
 108
 Id. at 83. Similarly, in Rodriguez de Quinonez v. Perez, 596 F.2d 486 (1st Cir.), cert. denied, 444 U.S. 840, 100 S.Ct. 78, 62 L.Ed.2d 51 (1979), the First Circuit stated:
 
 
 109
 "Clearly, furthermore, there was serious 'stigma' here. The very act of removal under this statute necessarily brings into question the directors' integrity. The statutory grounds for removal, phrased in the conjunctive, require a determination by the Secretary that 'there is evidence ... that such [statutorily enumerated] violation or failure is one involving personal dishonesty.'
 
 
 110
 It is true that, strictly read, the statute does not require an official determination or charge of dishonesty, but only a finding that there is sufficient 'evidence' of dishonesty to warrant invoking the statute. This superfine distinction would have little practical effect, however, in reducing the clear imputation of dishonesty flowing from removal under this statute. We thus think that removal [under the statute] affects a liberty interest requiring due process safeguards."
 
 
 111
 Id. at 489-90 (footnote omitted). Finally, in Cox v. Northern Virginia Transp. Comm'n, 551 F.2d 555 (4th Cir.1976), the Fourth Circuit stated:
 
 
 112
 "The commission defends on the ground that there is no proof that its officers expressly told reporters that Mrs. Cox was dishonest or immoral. It says that, instead, the reporters were told that she was incompetent and failed to establish good relations with the staff.
 
 
 113
 These comments, however, did not dispel the effect of the commissioners' published statements linking Mrs. Cox's discharge to the investigation of financial irregularities. Nor did the absence of formal charges of wrongdoing lessen the injury to her reputation that was caused by the interviews the commissioners granted the press. The opportunity of a discharged public employee to get a new job may be hampered as badly by official leaks to the press insinuating dishonesty as by a published official reprimand. In either event, therefore, the employee is entitled to a hearing."
 
 
 114
 Id. at 558.
 
 
 115
 The majority says McGhee I, our own decision, is distinguishable. But to me it seems as like the case before us now as Tweedledee and Tweedledum. In McGhee I allegations of improper behavior by a nontenured teacher did not originate with the school board which fired her. But the school board investigated these rumors in some of its meetings, without making any direct resolution, and it made public the minutes of its meetings in which the accusations were mentioned. This court held that the district court erred in directing a verdict in favor of the defendant school board in that situation. McGhee I, 564 F.2d at 910.
 
 
 116
 I would hold in the instant case that the police department took accusations originating with the FBI, dignified them by having a formal investigation, and contributed to the public awareness of charges, which, if not resolved, would severely damage Melton's reputation. I would hold that although perjury was an issue on the agenda of the Disciplinary Review Board hearing, because no evidence was permitted with respect to it and no resolution was made, in violation of the department's own regulations, the police department did too little to remedy the public's impression that Melton was a perjurer. I would hold that the police department's announcement that the firing of Melton was on a different basis, without any comment on the perjury issue, in the general context of the publicity surrounding the police department's actions was insufficient to meet the duty to dispel the stigma the department had helped create. The fact the jury awarded punitive damages, as well as actual damages, supports my perception that the public would believe defendants stigmatized Melton.
 
 II
 
 117
 Finally, in order to establish whether my separate opinion should be a concurrence in the court's judgment or a dissent, I believe that I must treat the other issues on which we granted en banc rehearing.
 
 
 118
 * The second issue for rehearing was whether the district court committed plain error in failing to instruct the jury that it must find that the stigmatizing charges were false before finding that Melton was deprived of liberty. As the majority notes, the Supreme Court has settled this issue in Codd v. Velger, 429 U.S. 624, 97 S.Ct. 882, 51 L.Ed.2d 92 (1977). In dealing with a liberty interest claim involving the discharge of a policeman, the Court stated, "When we consider the nature of the interest sought to be protected, we believe the absence of any such allegation [of falsity] or finding is fatal to [the officer's] claim under the Due Process Clause that he should have been given a hearing." Id. at 627, 97 S.Ct. at 884. Thus, a plaintiff must allege the falsity of the stigmatizing charge, which Melton did in the instant case. I R. tab 1/9/84 at 8 (Complaint). The Supreme Court probably would hold that the burden of proof of showing the falsity of the allegations is upon the plaintiff. See Restatement (Second) of Torts Sec. 580B comment j, Sec. 581A comment b (1976). See also Rosenstein v. City of Dallas, 876 F.2d 392, 395 n. 2 (5th Cir.1989), opinion reinstated in part, 901 F.2d 61 (5th Cir.) (en banc), cert. denied, --- U.S. ----, 111 S.Ct. 153, 112 L.Ed.2d 119 (1990).
 
 
 119
 The district court failed to include the element of falsity in Instruction 7, treating explicitly Melton's liberty interest claim; defendants, however, did not object; and the truth of the underlying charge of perjury was never an issue at the trial, as the majority notes. Thus, the court's error in this instruction does not require reversal.
 
 B
 
 120
 The district court instructed the jury that due process required that Melton be given a pre-termination hearing before an impartial tribunal, notice of the charges against him, a reasonable time before the hearing, an opportunity to be heard at a meaningful time and in a meaningful manner, and an opportunity to have an attorney present and to confront and cross-examine his accusers. I R. tab 141 at 16. The issues of pre- versus post-termination hearing and the type of hearing required are necessarily intertwined, and should be treated together. Again I think the Supreme Court has resolved these issues.
 
 
 121
 In Roth the Supreme Court stated flatly that, "When protected [liberty or property] interests are implicated, the right to some kind of prior hearing is paramount." 408 U.S. at 569-70, 92 S.Ct. at 2705 (emphasis added). In an explanatory footnote, the Court elaborated as follows:
 
 
 122
 "Before a person is deprived of a protected interest, he must be afforded opportunity for some kind of a hearing, 'except for extraordinary situations where some valid governmental interest is at stake that justifies postponing the hearing until after the event.' Boddie v. Connecticut, 401 U.S. 371, 379 [91 S.Ct. 780, 786, 28 L.Ed.2d 113]. 'While "[m]any controversies have raged about ... the Due Process Clause," ... it is fundamental that except in emergency situations (and this is not one) due process requires that when a State seeks to terminate [a protected] interest ..., it must afford "notice and opportunity for hearing appropriate to the nature of the case" before the termination becomes effective.' Bell v. Burson, 402 U.S. 535, 542 [91 S.Ct. 1586, 1591, 29 L.Ed.2d 90]. For the rare and extraordinary situations in which we have held that deprivation of a protected interest need not be preceded by opportunity for some kind of hearing, see [citations omitted]."
 
 
 123
 Roth, 408 U.S. at 570, 92 S.Ct. at 2705 (emphasis in original). Justice Stevens, in his dissent in Codd, 429 U.S. at 633, 97 S.Ct. at 887, quoted Roth as standing for the proposition that "the Constitution mandates 'a full prior hearing' " if a charge involves deprivation of a liberty interest. See also id. at 633 n. 3, 634, 97 S.Ct. at 887 n. 3, 887.
 
 
 124
 Nevertheless, in Arnett v. Kennedy, 416 U.S. 134, 94 S.Ct. 1633, 40 L.Ed.2d 15 (1974) (plurality opinion), then Justice Rehnquist, speaking only for himself, Chief Justice Burger and Justice Powell, distinguished the liberty interest in a discharge case from "the elemental freedom from external restraint," id. at 157, 94 S.Ct. at 1646, and stated:
 
 
 125
 "that liberty is not offended by dismissal from employment itself, but instead by dismissal based upon an unsupported charge which could wrongfully injure the reputation of an employee. Since the purpose of the hearing in such a case is to provide the person 'an opportunity to clear his name,' a hearing afforded by administrative appeal procedures after the actual dismissal is a sufficient compliance with the requirements of the Due Process Clause."
 
 
 126
 Id. (emphasis added).
 
 
 127
 The Supreme Court later revisited the issue of pre- versus post-termination hearings in Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985), in which it overruled Arnett in part. In Loudermill the Court addressed this issue in the context of a deprivation of a property right to employment, not liberty, see id. at 547 n. 13, 105 S.Ct. at 1496 n. 13, but I believe its holding is applicable to liberty interest claims as well. See Zinermon v. Burch, 494 U.S. 113, 110 S.Ct. 975, 108 L.Ed.2d 100 (1990) (requiring pre-deprivation hearing in liberty interest case of allegedly incompetent mental patient). The Court held in Loudermill:
 
 
 128
 "the Due Process Clause provides that certain substantive rights--life, liberty, and property--cannot be deprived except pursuant to constitutionally adequate procedures. The categories of substance and procedure are distinct. Were the rule otherwise, the Clause would be reduced to a mere tautology. 'Property' cannot be defined by the procedures provided for its deprivation any more than can life or liberty. The right to due process 'is conferred, not by legislative grace, but by constitutional guarantee....' "
 
 
 129
 . . . . .
 
 
 130
 "An essential principle of due process is that a deprivation of life, liberty, or property 'be preceded by notice and opportunity for hearing appropriate to the nature of the case.' Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306, 313 [70 S.Ct. 652, 656, 94 L.Ed. 865] (1950). We have described 'the root requirement' of the Due Process Clause as being 'that an individual be given an opportunity for a hearing before he is deprived of any significant property interest.' Boddie v. Connecticut, 401 U.S. 371, 379 [91 S.Ct. 780, 786, 28 L.Ed.2d 113] (1971) (emphasis in original); see Bell v. Burson, 402 U.S. 535, 542 [91 S.Ct. 1586, 1591, 29 L.Ed.2d 90] (1971). This principle requires 'some kind of a hearing' prior to the discharge of an employee who has a constitutionally protected property interest in his employment."
 
 
 131
 Loudermill, 470 U.S. at 541-42, 105 S.Ct. at 1493 (footnote omitted).
 
 
 132
 After reviewing the considerations that justify a pre-termination hearing the Court stated:
 
 
 133
 "The foregoing considerations indicate that the pretermination 'hearing,' though necessary, need not be elaborate. We have pointed out that '[t]he formality and procedural requisites for the hearing can vary, depending upon the importance of the interests involved and the nature of the subsequent proceedings.' Boddie v. Connecticut, 401 U.S., at 378 [91 S.Ct., at 786]. See Cafeteria Workers v. McElroy, 367 U.S. 886, 894-895 [81 S.Ct. 1743, 1748, 6 L.Ed.2d 1230] (1961). In general, 'something less' than a full evidentiary hearing is sufficient prior to adverse administrative action....
 
 
 134
 ... Here, the pretermination hearing need not definitively resolve the propriety of the discharge. It should be an initial check against mistaken decisions--essentially, a determination of whether there are reasonable grounds to believe that the charges against the employee are true and support the proposed action.
 
 
 135
 The essential requirements of due process, and all that respondents seek or the Court of Appeals required, are notice and an opportunity to respond. The opportunity to present reasons, either in person or in writing, why proposed action should not be taken is a fundamental due process requirement. The tenured public employee is entitled to oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story. To require more than this prior to termination would intrude to an unwarranted extent on the government's interest in quickly removing an unsatisfactory employee."
 
 
 136
 Loudermill, 470 U.S. at 545-46, 105 S.Ct. at 1495 (citations omitted).
 
 
 137
 In approving a less than full pre-termination hearing--one without a right to representation by an attorney or to cross-examine adverse witnesses--the Court explicitly relied upon a state statute which gave such rights post-termination: "Our holding rests in part upon the provisions in Ohio law for a full post-termination hearing." Id. at 546, 105 S.Ct. at 1495; see also id. at 547 n. 12, 105 S.Ct. at 1496 n. 12.
 
 
 138
 Following the reasoning of Loudermill, I would hold that a pre-termination hearing is required when charges have been made public or are intended to be released to the public at termination, and the charges are sufficiently serious to rise to the level of a liberty interest. Provided that a "full" post-termination hearing is available if requested by the employee, with the right to representation by an attorney and to present evidence and to confront and cross-examine witnesses who have made the accusations, I would hold that the pre-termination hearing may be limited as described in Loudermill.[2] That is, it may consist of notice, an explanation of the employer's evidence, and an opportunity to respond, in person or in writing, to the charge against the employee before final action is taken by the employer.
 
 
 139
 Our case law has required a pre-termination hearing when liberty interests are implicated, see, e.g., Richardson v. City of Albuquerque, 857 F.2d 727, 731 (10th Cir.1988); Walker v. United States, 744 F.2d 67, 70-71 (10th Cir.1984). To the extent those cases may be read to require more than is stated above, they should be overruled.
 
 
 140
 Applying this analysis to the case at hand, I believe it was error to give a jury instruction that a full scale adversarial pre-termination hearing was constitutionally required. But the error was harmless. Melton received notice but was given no pre-termination opportunity to confront the employer's evidence on the perjury charge. He was given no chance to address the accusation that he had lied under oath in the affidavit and at trial. The reason, apparently, was that the employer had decided that the perjury allegation was untrue, and it did not intend to rely upon it to terminate Melton. See XII R. 694. But the charge had been made public, and Melton was entitled to an equally public statement of his innocence, if the charge was admittedly false. That he did not get. Thus, Melton was denied the procedural process due him.
 
 
 141
 In conclusion, I would affirm the conclusion of the panel opinion that no retrial is warranted on the liberty interest claim.
 
 
 
 *
 Honorable William J. Holloway, Jr., Chief Judge, heard oral argument but did not participate in the decision of the case
 
 
 [1]
 There is some confusion whether this letter constituted the "charge" which impelled the subsequent departmental disciplinary proceedings. Lt. Smith's testimony negates that notion
 
 
 [2]
 That portion of Section 1.01 of the Oklahoma City Police Department's Operations Manual applicable to the accusation states: "Whatever I see or hear of a confidential nature or that is confided to me in my official capacity will be kept ever secret unless revelation is necessary to the performance of my duty."
 
 
 [3]
 When cross-examined about this quote and why he did not tell the reporter that there was no longer an investigation into the accusation of perjury, Lt. McBride stated: "Well, that's in response to a question posed to me about what part was alleged to have been perjury and I did not know and still don't know." (R.V. XII, 617)
 
 
 [4]
 About this statement Lt. McBride testified: "That was a quote taken out of an overall statement, that was not fair, that should not be reported. And I tried to discourage them from saying anything about that allegation." (R.V. XII, 619)
 
 
 [5]
 A member of the Board, Major Maxwell, stated in response to a question whether the Board had a prehearing discussion of the accusation of perjury: "It seems that we did, ... that we discussed that allegation would not be considered, because there was, you know, it just apparently appeared to be a misunderstanding rather than anything else."
 
 
 [6]
 This is not precisely the issue raised by Mr. Melton in the district court. The liberty interest claim advanced by the plaintiff in his complaint did not distinguish between the accusation of the ethics code violation and the accusation of perjury. Indeed, the second amended complaint merely averred:
 In discharging Plaintiff, Defendant Lloyd Gramling did not provide Plaintiff with a hearing which would meet procedural due process requirements. Furthermore, the basis for said discharge stigmatized Plaintiff and harmed his reputation in the community and amongst his fellow officers.
 (R. Vol. 1, Tab 29, 9). Moreover, the plaintiff's ultimate theory pleaded was that the defendants deprived him of rights secured by the Constitution by: "discharging Plaintiff based upon false and stigmatizing charges, thereby depriving Plaintiff of liberty without due process in violation of the Fourteenth Amendment to the Constitution of the United States; ..." Id. at 10. While plaintiff now recognizes that the essence of his claim has to be the denial of a name-clearing hearing, that was not the claim he presented to the district court. Since that distinction has not been pursued to this point in the case, we shall overlook it.
 
 
 [7]
 The dissent characterizes this as a new issue neither briefed nor argued. We, nonetheless, believe the question subsumed within and essential to the issues noted for en banc review
 
 
 [8]
 In that case, we stated:
 " 'The concept of liberty recognizes two particular interests of a public employee: 1) the protection of his good name, reputation, honor and integrity, and 2) his freedom to take advantage of other employment opportunitites.' " (citations omitted). The manner in which a public employee is terminated may deprive him of either or both of these liberty interests. When the termination is accompanied by public dissemination of the reasons for dismissal, and those reasons would stigmatize the employee's reputation or foreclose future employment opportunities, due process requires that the employee be provided a hearing at which he may test the validity of the proffered grounds for dismissal.
 Miller, 705 F.2d at 373 (citations omitted) (emphasis added).
 
 
 [9]
 Defendants now argue the court should not have given any instruction on the liberty interest claim, but they failed to object to the giving of the questioned instruction. Indeed, defense counsel did little to aid the trial court in this case
 
 
 [10]
 Because it is undisputed that the FBI's accusation that Mr. Melton perjured himself was not "the reason[ ] for his dismissal," there is an additional question whether this instruction conformed to the evidence. We shall not address that question because it is neither raised in nor a part of the questions for rehearing
 
 
 [11]
 The employee does not have to prove actual denial of a job opportunity. It is sufficient that a plaintiff prove termination based upon a publicized false charge of sufficient opprobrium that would make the plaintiff an unlikely candidate for employment by a future employer. See, e.g., Green v. St. Louis Housing Auth., 911 F.2d 65, 69 (8th Cir.1990) (Stigma sufficient if it involves dishonesty, serious felony, manifest racism, serious mental illness, or the like. Such "characteristics imply an inherent or at least a persistent personal condition, which both the general public and a potential future employer are likely to want to avoid.")
 
 
 [12]
 The significance of this fact is underscored by Codd. There, in describing the name-clearing hearing mandated by Roth, the Court stated: "Only if the employer creates and disseminates a false and defamatory impression about the employee in connection with his termination is such a hearing required." 429 U.S. at 628, 97 S.Ct. at 884 (citations omitted) (emphasis added). It is impossible, in this case, to say the employer created the false and defamatory impression when the original disclosure came from unidentified sources. If there is a "bottom line," as suggested by the dissent, it is Codd's use of the conjunctive requiring the employer to "create and disseminate[ ]" the false impression. The dissent is willing to overlook that pregnant conjunctive
 
 
 [13]
 The dissent contends it is significant that the police department failed to follow its own operating manual and make a formal determination of the FBI accusation. In the context of this case, that technical default really has no significance. It is undisputed that the department in fact made a determination that the accusation was groundless, and that determination was made before the hearing was held. It cannot be contended under these circumstances that the false accusation had any bearing on the disciplinary process. More importantly, as we have already noted, Codd's requirement of a factual dispute between the employer and employee (see p. 926, supra ) cannot be satisfied when both parties are in agreement that the false accusation is indeed false
 
 
 [14]
 We have also held that falsity is an element of a public employee's liberty interest claim. Rich v. Secretary of the Army, 735 F.2d 1220, 1227 (10th Cir.1984) (quoting Asbill v. Housing Auth. of Choctaw Nation, 726 F.2d 1499, 1501 (10th Cir.1984)); see also Derstein v. State of Kan., 915 F.2d 1410, 1414 (10th Cir.1990)
 Looking for parallels in state common law, we find that the literal truth of a report is a bar to a defamation action. Bahr v. Ettinger, 88 Or.App. 419, 745 P.2d 807, 808 (1987); Rosales v. City of Eloy, 122 Ariz. 134, 593 P.2d 688, 690 (Ariz.App.1979). Some courts, however, have recognized that a literally true statement, when considered in context, can lead to false impressions which create liability for defamation. The distinction between those reports which are actionable and those which are not is what the reporter intends and what the average reader perceives from the report. See Lyons v. Rhode Island Publishing Employees Council 94, 516 A.2d 1339, 1343-45 (R.I.1986). Thus, one who reports a fact with the intent that it be understood as defaming may be guilty of stigmatization that would support a liberty interest claim. See Martin v. Wilson Pub. Co., 497 A.2d 322 (R.I.1985). That, however, is not the evidence in this case.
 
 
 [15]
 The dissent appears to be willing to assume the public in Oklahoma City notwithstanding would have believed to the contrary. This assumption seems based upon the testimony of one police officer that the "law enforcement community" believed Mr. Melton was discharged for perjury. There is nothing in the evidence, however, to suggest any public perception of that result
 
 
 [16]
 The dissent minimizes our distinction of this case from McGhee, brushing aside our analysis as "Tweedledee and Tweedledum." However, the factual distinctions cannot be so easily ignored. Those distinctions are found in these factual recitations from McGhee:
 In November, 1973, [plaintiff] was called to a board meeting where several persons made some accusations against her. One man called her a "sexpot" and said she taught sex in the classroom; his wife made similar comments and said she was unfit to teach students; another couple said she was immoral, her conduct was not fit and that she was unfit to teach students; another man called her a liar.
 McGhee, 564 F.2d at 906.
 On April 3 Superintendent Draper asked plaintiff to come to a board meeting that night. When she arrived students were being interviewed by the board, ... Plaintiff went in last. Mr. Draper asked her if the book, "The Angel Inside Went Sour," was hers. [The book allegedly contained pornographic material.] She said it was not, that she had not seen it, and had not put it in the classroom. Mr. Draper replied that they had affidavits stating that David Hendren checked it out of her classroom.
 ....
 On April 5 the board met again without any notice or request that plaintiff appear. The minutes of that meeting state that a resolution was passed unanimously that plaintiff's contract be discontinued as of June 30, 1974, ...
 ....
 Thus, the letter and minutes from the board made no specific charges or findings against plaintiff. However, the minutes of the meeting on April 2 noted the appearance of a large group of protesting patrons, student statements about the book, ... the discussions on April 3 by Superintendent Draper with four students about the book matter, ...
 Id. at 907.
 At the May 6 hearing, plaintiff's attorney inquired whether the book was the reason for plaintiff's discharge. Mr. Draper replied they would have 75 people the next night if the board "rescinded itself" and that they had to work with public opinion. Plaintiff's counsel asked defendant Billups [a board member] if he knew anything about plaintiff's moral character, and Billups replied he knew enough to make him "sick."
 ....
 There was a statement by Superintendent Draper that he recommended that the board reverse itself "because of the book," and that he was convinced that one book had been sold by plaintiff, which a teacher should not be selling. There were some responses by board members suggesting moral improprieties, but there was no charge or finding identified as the basis of the board's actions.
 Id. at 908 (footnotes omitted).
 It is true that the board's letters and resolutions stated no charges or findings. Nevertheless, the board's minutes focused attention on the allegedly pornographic materials ... and affidavits held by the board charged misconduct with male students and drunkenness, all of which plaintiff denied.
 Id. at 910.
 
 
 [1]
 Most of the Tenth Circuit decisions related to employment are consistent with this analysis: See Conaway v. Smith, 853 F.2d 789, 794 (10th Cir.1988) (charges of neglect of duties and insubordination not stigmatizing); Sullivan v. Stark, 808 F.2d 737, 739 (10th Cir.1987) (charges of being negligent or derelict in performing duties not stigmatizing); Ewers v. Board of County Comm'rs, 802 F.2d 1242, 1249 (10th Cir.1986), cert. denied, 484 U.S. 1008, 108 S.Ct. 704, 98 L.Ed.2d 655 (1988), reh'd on other grounds, 874 F.2d 736 (10th Cir.1989) (charges that the employee "padded the books" and "dragged out" cooperative jobs stigmatizing); Bailey v. Kirk, 777 F.2d 567, 580 (10th Cir.1985) (accusation of misappropriation of police property sufficiently stigmatizing); Sipes v. United States, 744 F.2d 1418, 1422 (10th Cir.1984) (charges of "being tardy, failing to schedule leave (noted as 'lack of reliance'), and for engaging in 'horseplay' " not stigmatizing); Walker v. United States, 744 F.2d 67, 69 (10th Cir.1984) (per curiam) (charges that employee lied on employment form stigmatizing); Lentsch v. Marshall, 741 F.2d 301, 304 (10th Cir.1984) (charges of dishonesty stigmatizing); Martin v. Unified School Dist. No. 434, 728 F.2d 453, 455-56 (10th Cir.1984) (statement that plaintiff's contract was not renewed based "on occurrences this year and continuance of previous concerns" not stigmatizing); Asbill v. Housing Authority of Choctaw Nation, 726 F.2d 1499, 1503 (10th Cir.1984) (charge that employee challenged authority of new agency director not stigmatizing); Stritzl v. United States Postal Service, 602 F.2d 249, 252 (10th Cir.1979) (charges of slow work with poor work habits and low productivity not stigmatizing); but see Garcia v. Board of Educ. of Sacorro Consol. School Dist., 777 F.2d 1403, 1419-20 (10th Cir.1985), cert. denied, 479 U.S. 814, 107 S.Ct. 66, 93 L.Ed.2d 24 (1986) (claims that plaintiff caused low staff morale and that he was difficult to work with stigmatizing); Miller v. City of Mission, 705 F.2d 368, 373 (10th Cir.1983) (charges that police department "morale was very low, the officers do not respect the Chief and Assistant Chief. The department had deteriorated to an extend [sic] that the men felt that they could not work effectively with the Chief and Assistant Chief" stigmatizing)
 Most other circuit decisions are also consistent with this view of the law. The Ninth Circuit adheres to a "moral turpitude" standard. Kraft v. Jacka, 872 F.2d 862, 870 (9th Cir.1989) ("The statements at issue must involve charges which rise to the level of 'moral turpitude;' 'charges that do not reach this level of severity do not infringe constitutional liberty interests.' ") (quoting Bollow v. Federal Reserve Bank of San Francisco, 650 F.2d 1093, 1101 (9th Cir.1981), cert. denied, 455 U.S. 948, 102 S.Ct. 1449, 71 L.Ed.2d 662 (1982)). See also Finkelstein v. Bergma, 881 F.2d 702, 704 (9th Cir.1989) (charges that plaintiff gained access to confidential personnel files in an unauthorized, underhanded, and perhaps illegal manner held stigmatizing). The Fifth Circuit has at times used the "badge of infamy" standard. See Evans v. City of Dallas, 861 F.2d 846, 851 (5th Cir.1988); see generally Rosenstein v. City of Dallas, 876 F.2d 392, 395 n. 2 (5th Cir.1989), opinion reinstated in part, 901 F.2d 61 (5th Cir.) (en banc), cert. denied, --- U.S. ----, 111 S.Ct. 153, 112 L.Ed.2d 119 (1990). See also Green v. St. Louis Housing Authority, 911 F.2d 65, 70 (8th Cir.1990) (charges of unsatisfactory job performance insufficient); Hannon v. Turnage, 892 F.2d 653, 660 (7th Cir.1990), cert. denied, --- U.S. ----, 111 S.Ct. 69, 112 L.Ed.2d 43 (1990) (statements that plaintiff was no longer employed in connection with licensing problems at the VA hospital insufficient); Chabel v. Reagan, 841 F.2d 1216, 1223 (3d Cir.1988) (charge that employee acted "on his belief that he was duty-bound to follow the directives of the judges of his district rather than the contrary order of his superior in Washington" not stigmatizing); Brandt v. Board of Cooperative Educational Services, 820 F.2d 41, 44-45 (2d Cir.1987) (charges of sexual misconduct stigmatizing); Harrison v. Bowen, 815 F.2d 1505, 1518 (D.C.Cir.1987) (false charge of unsatisfactory job performance insufficient); Doe v. United States Dep't of Justice, 753 F.2d 1092, 1110 (D.C.Cir.1985) (charges of unprofessional conduct and dishonesty stigmatizing); Hadley v. County of Du Page, 715 F.2d 1238, 1245 (7th Cir.1983), cert. denied, 465 U.S. 1006, 104 S.Ct. 1000, 79 L.Ed.2d 232 (1984) (charges of mismanagement not stigmatizing); Blair v. Board of Regents, 496 F.2d 322, 324 (6th Cir.1974) (dismissal for failure to meet minimum standards not stigmatizing). But see Doe v. Chaney, 885 F.2d 898, 909-10 (D.C.Cir.1989) (charge that employee was a security risk not stigmatizing); Huntley v. Community School Bd. of Brooklyn, 543 F.2d 979, 985 (2d Cir.1976) (charges of poor and ineffective leadership stigmatizing), cert. denied, 430 U.S. 929, 97 S.Ct. 1547, 51 L.Ed.2d 773 (1977); Greenhill v. Bailey, 519 F.2d 5, 8 (8th Cir.1975) (charges plaintiff was dismissed for lack of intellectual ability stigmatizing); Adams v. Walker, 492 F.2d 1003, 1008 (7th Cir.1974) (charges of incompetence, neglect of duty and malfeasance in office not stigmatizing); Jeffries v. Turkey Run Consol. School Dist., 492 F.2d 1, 2-3 (7th Cir.1974) (dismissal for highly unethical conduct not stigmatizing).
 
 
 [2]
 A city council, school board, or, as here, a police disciplinary review board, would be a proper adjudicator providing its membership is composed only of those who have the capacity to make a neutral or unbiased decision