Sharlene K. WATSON, Plaintiff–
Appellant,

v.

UNIVERSITY OF UTAH MEDICAL CENTER, Dale Gunnell, Director of University of Utah Medical Center; Evelyn Hartigan, Individually and as Administrative Director of Nursing; William Duncan, Individually and as Employee of Human Resource; Sally Heard, Individually and as Head Nurse of Labor and Delivery; Donna Harland, Individually and as Director of Nursing; Heidi Klenk; William T. Evans; Robert Steed; David Robinson, Director of Division of Occupational and Professional Licensing, Defendants–Appellees.

No. 94–4209.

United States Court of Appeals,
Tenth Circuit.

Jan. 19, 1996.

Blake S. Atkin of Atkin & Lilja, Salt Lake City, Utah, for Plaintiff–Appellant.

Elizabeth King, Assistant Attorney General (Jan Graham, Attorney General, with her, on the brief), Salt Lake City, Utah, for Defendants–Appellees.

Before MOORE and LOGAN, Circuit Judges, and COOK, District Judge.*

---

* The Honorable H. Dale Cook, Senior United States District Judge, United States District Court for the Northern District of Oklahoma, sitting by designation.

LOGAN, Circuit Judge.

Plaintiff Sharlene K. Watson appeals the district court's grant of summary judgment in favor of defendants University of Utah Medical Center (Medical Center) and several Medical Center employees, most of whom she sued in both their official and individual capacities, in her suit brought under 42 U.S.C. § 1983.[1] Her amended complaint alleged that these defendants violated her due process rights under the Fifth and Fourteenth Amendments when they participated in disciplinary action taken against her as an employee of the Medical Center. Reading her complaint liberally, plaintiff asserted defendants deprived her of her liberty interest in practicing her profession as a nurse and her property rights in her public employment and in her nursing license, all without due process of law.

On appeal plaintiff argues the district judge erred in ruling that (1) the Medical Center and defendants, insofar as they were sued in their official capacities, are entitled to immunity under the Eleventh Amendment; and (2) the individual defendants are entitled to qualified immunity insofar as they were sued as individuals.

I

Plaintiff was working as a labor and delivery nurse on February 22, 1992, when she participated in the birth of a baby at the Medical Center. Although a medical doctor, David Dowling, was present plaintiff delivered the baby. The Medical Center had a policy that nurses could deliver only "in emergency situations (precipitous deliveries)." App. 80. The parties dispute whether that condition was met here. Plaintiff's version is that she knew that Dr. Dowling had been vomiting earlier in the evening, that he

arrived just before the birth, and that he requested that she deliver the baby under his supervision. One of the defendants, nurse Heidi Klenk, was present at the birth; she stated that the delivery was not imminent when the doctor entered the room, but that plaintiff told the doctor it was her baby to deliver. Dr. Dowling gave somewhat different accounts of the delivery on different occasions but essentially stated that he did, in one or two words, ask plaintiff to perform the delivery. He also stated that although he had been ill that evening he could have delivered the baby, but that plaintiff could well have believed he was asking her to deliver the baby because he was too ill to do so.

A few days after the delivery, Klenk informed defendant Donna Harland, director of nursing, and defendant Sally Heard, head nurse of labor and delivery, that she believed plaintiff had acted improperly in delivering the baby. Shortly thereafter, Heard, Harland, and defendant William Duncan, Medical Center Human Resource Director, met with plaintiff to discuss the allegedly improper delivery. Plaintiff asserts Duncan and Heard told her they would make an example of her because they did not want nurses delivering babies. Plaintiff responded with her version of the events and asked that they speak with two other employees present during the delivery, Dr. Dowling and nurse Tyra Robinson, to determine what occurred. Duncan and Heard agreed to do so. At this meeting they informed plaintiff that if she had delivered a baby against Medical Center policy her employment could be terminated.

On March 2, 1992, plaintiff met with Duncan, Heard and Harland a second time and presented, along with her own recounting, four coworkers as witnesses. Dr. Dowling was not present, however, and plaintiff contends that Dowling's supervisors discouraged

---

1. The complaint names as defendants Robert Steed, Utah Department of Commerce, Division of Occupational and Professional Licensing, (DOPL) and David Robinson, Director of Division of Occupational and Professional Licensing. The district court found that DOPL was entitled to Eleventh Amendment immunity from damages. The district court also found that the issuance of a letter from the DOPL mooted the other claims against DOPL and DOPL officials Steed and Robinson in their official and individual

capacities. Although the DOPL is mentioned as an appellee a few times in plaintiff's appellate briefs no argument is made against the DOPL defendants, and we do not consider claims against them as part of this appeal.

The complaint also listed claims under Utah common law. The district court declined to exercise jurisdiction over plaintiff's state law claims, dismissing them without prejudice. No argument is made on appeal with respect to the state law claims.

his attendance. Further, plaintiff asserts that one of her coworkers, nurse Robinson, was harassed in the meeting and told to leave. After a five-hour meeting, Duncan and Harland notified plaintiff that she would be placed on administrative leave without pay and that the matter would be referred to the state Division of Professional Licensing (DOPL) for investigation.

Plaintiff asserts that she then requested from defendant Evelyn Hartigan, Associate Administrator/Associate Dean of the College of Nursing, an appointment to protest the outcome under Medical Center employee grievance procedures. Hartigan cancelled the meeting; plaintiff states that Hartigan called her and told her she had nothing to grieve.

DOPL investigated. Apparently at first it found no violation; then it changed its decision and thereafter changed its decision again. In May 1992, plaintiff filed this suit.[2] The record shows the Medical Center took no further action concerning plaintiff's employment; she apparently remained on unpaid administrative leave. Plaintiff did not actively seek another job until October 1992, and found employment in December 1992.[3]

Defendants moved for summary judgment. The district court ruled that the Medical Center was entitled to Eleventh Amendment immunity. The court rejected the individual defendants' claims to absolute immunity, based on their assertion that they acted in an adjudicatory capacity when they determined whether plaintiff was subject to disciplinary action for violating hospital policy. The court ruled, however, that the individual defendants were entitled to qualified immunity, because plaintiff failed to meet her burden of establishing that at the time she was placed on leave without pay defendants' actions violated clearly established law.

On appeal, we review the district court's grant of summary judgment de novo, applying the legal standard of Fed.R.Civ.P. 56(c). Summary judgment is appropriate if the record shows that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Wolf v. Prudential Ins. Co. of Am.*, 50 F.3d 793, 796 (10th Cir.1995). In applying this standard, "we examine the factual record and reasonable inferences therefrom in the light most favorable to the party opposing summary judgment." *Id.*

## II

We first address the issue of the Medical Center's immunity from liability under the Eleventh Amendment. The Eleventh Amendment bars a suit for damages against a state in federal court, absent a waiver of immunity by the state. *Edelman v. Jordan*, 415 U.S. 651, 663, 94 S.Ct. 1347, 1355–56, 39 L.Ed.2d 662 (1974). Congress did not abrogate state Eleventh Amendment immunity when it enacted § 1983, *Quern v. Jordan*, 440 U.S. 332, 341, 99 S.Ct. 1139, 1145, 59 L.Ed.2d 358 (1979); however, that immunity extends only to the states and governmental entities that are "arms of the state." *Ambus v. Granite Bd. of Educ.*, 995 F.2d 992, 994 (10th Cir.1993) (en banc). The arm-of-the-state doctrine bestows immunity on entities created by state governments that operate as alter egos or instrumentalities of the states. *Mascheroni v. Board of Regents of the Univ. of Cal.*, 28 F.3d 1554, 1559 (10th Cir.1994).

To make the determination whether an entity is an arm of the state we engage in two general inquiries. "[T]he court first examines the degree of autonomy given to the agency, as determined by the characterization of the agency by state law and the extent of guidance and control exercised by the state. Second, the court examines the

---

**2.** Plaintiff's suit included a request for temporary restraining order, preliminary injunction and permanent injunction requiring that DOPL take no action other than to dismiss the Medical Center's complaint to the DOPL. The DOPL took no action after the suit was filed until it agreed to send a letter essentially stating that no action would be taken on plaintiff's nursing license.

**3.** Plaintiff states that she delayed looking for work, in part because she expected to resume employment at the Medical Center, and in part because she had a baby in August 1992.

extent of financing the agency receives independent of the state treasury and its ability to provide for its own financing." *Haldeman v. State of Wyo. Farm Loan Bd.*, 32 F.3d 469, 473 (10th Cir.1994); *see also Mascheroni*, 28 F.3d at 1559. "The governmental entity is immune from suit if the money judgment sought is to be satisfied out of the state treasury." *Haldeman*, 32 F.3d at 473.

Our cases have consistently found state universities are arms of the state. *See Mascheroni*, 28 F.3d at 1559 (University of California); *Seibert v. State of Okla.*, 867 F.2d 591, 594 (10th Cir.1989) (University of Oklahoma); *Prebble v. Brodrick*, 535 F.2d 605, 610 (10th Cir.1976) (University of Wyoming); *Brennan v. University of Kan.*, 451 F.2d 1287, 1290 (10th Cir.1971) (University of Kansas and University of Kansas Press); *see also Korgich v. Regents of N.M. Sch. of Mines*, 582 F.2d 549, 551–52 (10th Cir.1978) (New Mexico School of Mines).

■ Turning to the University of Utah we note the Utah legislature established a State Board of Regents which has the "power to govern the state system of higher education consistent with state law," and is vested with the "control, management, and supervision" of the University. Utah Code Ann. §§ 53B-1–101(2), 103(2). Fifteen of the sixteen members of the Board of Regents are appointed by the governor with the consent of the state senate, *id.* §§ 53B-1–104(1), and the Board of Regents appoints the president of the University of Utah, *id.* § 53B-2–102. The University of Utah has a Board of Trustees with ten members—eight appointed by the governor—which is responsible for many administrative functions of the University. *See id.* §§ 53B-2–103, 104(1). The University holds all of its real and personal property as a trustee of the State Board of Regents. *See id.* § 53B-20–101. *Pharmaceutical & Diagnostic Servs. v. University of Utah*, 801 F.Supp. 508 (D.Utah 1990), in finding the University of Utah is an arm of the state, relied on some of these provisions, as well as the Utah Supreme Court's determination that "[t]he university is clearly a state institution." *See id.* at 512 (citing *University of Utah v. Board of Examiners*, 295 P.2d 348 (Utah 1956)). We are satisfied that the University is not autonomous but rather is a state-controlled entity.

We move then to the second area of inquiry: the degree of state funding and the University's ability to issue bonds and raise taxes, i.e., the likelihood that a judgment against the University might be paid from state funds. *See Ambus*, 995 F.2d at 996. Like the school district in *Ambus*, the University participates in the Utah Risk Management Fund which provides, in part, insurance against money judgments. *See* Utah Code Ann. § 63A-4–103. However, school districts are subject to special provisions under the Act, *see id.*, § 63A-4–204, and the statute makes a clear distinction between state agencies and public school districts, which are treated as state agencies for purposes of the Risk Management Fund. The language of the risk management statute, *id.* § 63A-4–103, refers to the Board of Regents and its higher education institutions as state agencies, and requires that when the Board of Regents authorizes the higher education institutions to purchase their own insurance, it "shall ensure that the state is named as an additional insured on any of those policies." This suggests that the state might be responsible for funding a judgment against the University of Utah. Further, although the University may "handle its own financial affairs" under the general supervision of the Board, *id.* § 53B-7–101(9), the budget of the University is controlled to a large degree by the State Board of Regents, the legislature and the governor. *See id.* § 53B-7–101. It does appear that any judgment against the University might be satisfied, at least indirectly, from state resources.

■ Although we are satisfied that the University is an arm of the state, the more difficult question is whether the University of Utah Medical Center has that status. Plaintiff contends that the Medical Center is a separate and distinct entity that is "more akin to the private hospitals with which it competes." Appellant's Brief at 7. She points out that a small fraction (less than five percent) of the Medical Center's operating income comes from the state, and states that "any judgment obtained against the Medical Center in this case could easily come from

patient revenues rather than from any state coffers." *Id.* She also asserts that, in *Condemarin v. University Hospital,* 775 P.2d 348, 366 (Utah 1989), the Utah Supreme Court found that the Medical Center is not an arm of the state. She quotes Justice Stewart's observations in *Condemarin* that the Medical Center is "essentially supported by non-state funds" and that the hospital is "practically [ ] self-supporting." *See Condemarin,* 775 P.2d at 373–74.

The holding of *Condemarin,* however, is that Utah statutes limiting tort recovery are unconstitutional as applied to the Medical Center. This holding rested in part upon the reasoning that

> The problem with Utah's Governmental Immunity Act is that is has created limited liability under the screen of governmental immunity for activities which were traditionally subject to the deterrent effects of tort liability. Furthermore, notwithstanding the fact that it is a government-owned health care facility, the [Medical Center], in its patient care programs, virtually operates in the public sector, competing with other private, nonprofit entities, as well as with for-profit hospitals. In the area of patient service, it is not in the business of establishing government policy. For that reason, the common law exception existed to prevent governmental immunity from barring medical malpractice actions in Utah, and for that reason, the deterrence factor in the balancing analysis this Court should apply weighs in favor of liability, not limitation.

*Id.* at 365 (footnote omitted). Plaintiff cites *Condemarin* for the proposition that the Medical Center did not demonstrate that "requiring the hospital to shoulder the full cost of liability will have a substantial effect on the state's treasury." *Id.* at 374. That statement appears in Justice Stewart's separate opinion, and is not the question we must answer. Although plaintiff states that *Condemarin* found that the Medical Center is not an arm or alter ego of the state, we do not read *Condemarin* as so holding. In fact, the majority in *Condemarin* stated that "[the Medical Center] is a government-owned health care facility." *Id.* at 365.

Our review of the record supports the conclusion that the Medical Center is an integral part of the University of Utah. The Medical Center is governed by the University Board of Trustees, and its annual budget is subject to approval by the University Board and the State Board of Regents. The Bylaws of the Medical Center, Article I, provide that the Medical Center is a "component organization" of the University of Utah. Supp.App., Bylaws at 1. The Medical Center Board is "created by, and subject to the authority of the President of the University and the Institutional Council," and members are "appointed by the president of the University with approval by the Institutional Council." *Id.,* Bylaws, Arts. III and IV. Finally, the University president and Institutional Council retain authority to grant final approval for the long range plan of the Medical Center, the annual budget and appropriations request, major construction, capital financing, fund raising programs, and University policies, procedures, rules, and regulations "relating to or affecting" the Medical Center. *Id.,* Art. V. Further, the Chief Operating Officer of the Medical Center reports directly to the University Vice President for Health Sciences. *Id.,* Art. VII.

The Medical Center clearly is not autonomous from the University or the state. The bothersome question is whether a judgment against the Medical Center would come from the state treasury. It is undisputed that the Medical Center receives most of its budget from patient billing and only a small amount of its funding, somewhere between 3.5 and 5%, comes from state appropriations. Although, unlike local school boards, it cannot raise taxes or issue bonds without approval of the state, the Medical Center can increase patient billings, thus reducing the likelihood that any judgment will be paid from state funds. The only definite statement concerning monies to satisfy a judgment appears in the Risk Management Fund manager's statement: The bulk of any judgment would be paid from the state Risk Management Fund, although twenty-five percent of a back wages award would come from the University. *See* IV R. doc. 121. The funding issue makes

this a close case, but on balance we agree with the district court's determination that the University of Utah Medical Center, as a part of the University of Utah, is an arm of the state entitled to Eleventh Amendment immunity. The district court thus correctly found that the Medical Center and the individual defendants sued in their official capacities are entitled to the state's immunity. *See Brennan,* 451 F.2d at 1290–91.

### III

We turn now to the issue whether the district erred in finding that the individual defendants are entitled to qualified immunity. "[G]overnment officials performing discretionary functions, generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). Qualified immunity protects defendants not only from liability but also from suit. *Id.*

Once the defendant raises the defense of qualified immunity, "the plaintiff then has the burden to show with particularity facts and law establishing the inference that the defendants violated a constitutional right." *Walter v. Morton,* 33 F.3d 1240, 1242 (10th Cir.1994). "This burden is quite heavy ... for the plaintiff must do more than simply allege the violation of a general legal precept. The plaintiff must 'instead demonstrate a substantial correspondence between the conduct in question and prior law allegedly establishing that the defendant's actions were clearly prohibited.'" *Jantz v. Muci,* 976 F.2d 623, 627 (10th Cir.1992) (quoting *Harlow,* 457 U.S. at 818, 102 S.Ct. at 2738), *cert. denied,* 508 U.S. 952, 113 S.Ct. 2445, 124 L.Ed.2d 662 (1993). "The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Id.* (quoting *Anderson v. Creighton,* 483 U.S. 635, 640, 107

S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987)). Only if plaintiff makes that threshold showing does the burden shift to defendants to show that no material facts remain in dispute that would defeat defendant's claim of qualified immunity. *Id.* The district court found that "plaintiff's general claims of being denied property and liberty interests without due process are insufficient to satisfy her shifted burden of establishing that defendants' alleged actions violated clearly established law at the time of her being placed on administrative leave without pay."[4] App. 17.

"To assess whether an individual was denied procedural due process, 'courts must engage in a two-step inquiry: (1) did the individual possess a protected interest such that the due process protections were applicable; and, if so, then (2) was the individual afforded an appropriate level of process.'" *Hatfield v. Board of County Comm'rs,* 52 F.3d 858, 862 (10th Cir.1995) (quoting *Farthing v. City of Shawnee,* 39 F.3d 1131, 1135 (10th Cir.1994)); *see also Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 541, 105 S.Ct. 1487, 1492–93, 84 L.Ed.2d 494 (1985). In asserting a procedural due process violation, a plaintiff must first demonstrate that she had a protected property or liberty interest. Plaintiff asserts, as we read her complaint and pleadings, deprivation of process in regard to three separate protected interests. We address each in turn.

### A

First, plaintiff appears to contend she had a property interest in her continued public employment at the Medical Center. The question whether a plaintiff had a protected property interest is determined by state law. *Casias v. City of Raton,* 738 F.2d 392, 394 (10th Cir.1984). Under Utah law, "any employment contract which has no specified term of duration is an at-will relationship," *Berube v. Fashion Centre, Ltd.,* 771 P.2d 1033, 1044 (Utah 1989), and

---

4. The district court stated that despite plaintiff's allegations that defendants acted with malice this is not a case in which defendant's subjective intent is an element of the claim. App. 17 (quot-

ing *Harlow,* 457 U.S. at 817, 102 S.Ct. at 2737–38) ("bare allegations of malice" do not defeat qualified immunity).

such employment may be terminated at any time by the employer. *Brehany v. Nordstrom, Inc.,* 812 P.2d 49, 53 (Utah 1991). An employee may rebut this presumption of at-will employment by showing that "the parties expressly or impliedly intended a specified term or agreed to terminate the relationship for cause alone." *Berube,* 771 P.2d at 1044.

■ In the instant case, plaintiff does not contend that she had a contract for a specific term. She refers to an employee handbook that provides for a grievance procedure for employees. Under Utah law an employment manual or handbook that provides employees cannot be fired except for cause can rebut the presumption of employment at will. *See Johnson v. Morton Thiokol, Inc.,* 818 P.2d 997, 1000–01 (Utah 1991).

The problem here is that plaintiff did not produce evidence of what the employment manual said in this regard, nor did she provide a copy of the grievance procedure. She points to statements by defendants that they knew she was entitled to a grievance procedure. But those statements do not provide any information as to what the grievance procedure involved. She identifies no Utah statutes on which a property interest might be grounded. *Cf. Ambus v. Granite Bd. of Educ.,* 975 F.2d 1555, 1562 (10th Cir.1992), *modified and aff'd en banc,* 995 F.2d 992 (10th Cir.1993) (tenured teacher's property interest in continued employment created by Utah statute on termination of school employees and professional agreement).

Plaintiff did not meet her burden to establish a property interest in continued employment. *See Conaway v. Smith,* 853 F.2d 789, 793–94 (10th Cir.1988) (plaintiff failed to produce manual that might have established termination procedures; did not meet burden to show property interest in continued employment). Because plaintiff failed to make a showing that she had a protected property interest in continued employment, she failed to meet her burden to show defendants violated a clearly established right. Thus, defendants are entitled to qualified immunity as to this claim.

**B**

■ As to plaintiff's allegations that defendants denied her due process with regard to her property right to her nursing license, she has not shown enough: DOPL took no action to revoke or suspend her license. *See Phelps v. Wichita Eagle–Beacon,* 886 F.2d 1262, 1269 (10th Cir.1989) (discussing fact that plaintiff did not lose status as lawyer; thus failed to state a deprivation of liberty or property interest). Further, in a typical due process case in which an employment status decision is not dependent on a DOPL determination, hospital officials/employers would be free to ask DOPL for clarification of their initial determination. This is especially so because the Medical Center had previously been investigated by DOPL for reports of nurses delivering babies. *See* II R. doc. 70.

**C**

■ Plaintiff also asserted that her liberty interests were implicated by defendants' actions surrounding the decision to place her on administrative leave without pay. We have recognized that "[w]hen a public employer takes action to terminate an employee based upon a public statement of unfounded charges of dishonesty or immorality that might seriously damage the employee's standing or associations in the community and foreclose the employee's freedom to take advantage of future employment opportunities, a claim for relief is created." *Melton v. City of Oklahoma City,* 928 F.2d 920, 927 (10th Cir.) (en banc), *cert. denied,* 502 U.S. 906, 112 S.Ct. 296, 116 L.Ed.2d 241 (1991).

■ Once plaintiff has identified a clearly established right, we examine whether she has come forward with the necessary factual allegations, *Ramirez v. Oklahoma Dep't of Mental Health,* 41 F.3d 584, 593 (10th Cir.1994), to establish that defendants violated that right. Plaintiff asserts that defendants infringed her liberty interest in her professional reputation and ability to obtain future employment by charges they made after they placed her on administrative leave. In order to show that defendants infringed on her liberty interest, plaintiff must show several elements.

First, to be actionable, the statements must impugn the good name, reputation, honor, or integrity of the employee. *Board of Regents v. Roth,* 408 U.S. [564, 573, 92 S.Ct. 2701, 2707, 33 L.Ed.2d 548 (1972)]. Second, the statements must be false. *Codd v. Velger,* 429 U.S. 624, 628 [97 S.Ct. 882, 884–85, 51 L.Ed.2d 92 (1977)]. Third, the statements must occur in the course of terminating the employee or must foreclose other employment opportunities. *Paul [v. Davis,* 424 U.S. 693, 710, 96 S.Ct. 1155, 1164–65, 47 L.Ed.2d 405 (1976) ]. And fourth, the statements must be published. *Bishop v. Wood,* 426 U.S. 341, 348 [96 S.Ct. 2074, 2079, 48 L.Ed.2d 684 (1976)]. These elements are not disjunctive, all must be satisfied to demonstrate deprivation of the liberty interest. *See, e.g., Melton v. City of Oklahoma City,* 928 F.2d 920 (en banc) (trial court erred in instructing jury to find either stigmatization or loss of employment opportunities), *cert. denied,* [502 U.S. 906, 112 S.Ct. 296, 116 L.Ed.2d 241 (1991) ].

*Workman v. Jordan,* 32 F.3d 475, 481 (10th Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 1357, 131 L.Ed.2d 215 (1995) (some citations omitted). We turn now to whether plaintiff raised questions of fact as to each of these elements.

Plaintiff produced evidence that her supervisors made public statements to the entire nursing staff not only that she had "illegally" delivered a baby but also that she lied about the incident. *See* App. 109–10. These public charges certainly impugn her honesty and integrity. Plaintiff also produced evidence that these charges were false. First, as to delivering the baby, the DOPL initially determined that plaintiff had done nothing wrong and eventually concluded that it would take no action. Further, as to plaintiff being "a liar," the record contains conflicting evidence as to what actually occurred in the delivery room. Nurse Robinson's version, and to some extent Dr. Dowling's version, support the conclusion that plaintiff told the truth about the delivery; defendant Klenk's statements contradict plaintiff's version of events, and there is evidence that defendants published to others that Klenk's version was correct and plaintiff's version was false.

Thus, plaintiff produced a question of material fact as to whether defendants' charges that plaintiff "illegally" delivered a baby and then lied about it were false.

Next, plaintiff must show defendants made the statements in the course of terminating her employment. The allegedly false statements here were made after defendants placed plaintiff on administrative leave without pay, but we believe the jury could find plaintiff was constructively discharged. Plaintiff produced evidence that defendants agreed to abide by the DOPL decision but then attempted and apparently initially succeeded in getting the DOPL to change that decision when it was in favor of plaintiff. *See infra* footnote 6. When the DOPL finally changed its determination, after plaintiff filed this lawsuit, the Medical Center defendants never offered to reinstate plaintiff. Thus, although plaintiff initially was placed on leave without pay, if defendants never took any action to reinstate her, a jury could find that the alleged defamation "occurred in the course of the termination of employment." *Melton,* 928 F.2d at 926.

Finally, plaintiff made a showing that defendants' actions foreclosed her future employment opportunities in her chosen field as a labor and delivery nurse. Although she was able to secure employment as a nurse, it was not as a labor and delivery nurse as a result of dissemination of information concerning her troubles in the relatively close-knit hospital community in Salt Lake City. *See* App. 115; II R. doc. 70 (plaintiff's deposition).

We believe plaintiff has set out a claim of a liberty deprivation—she has raised an issue of material fact whether "her dismissal resulted in the *publication* of information which was *false* and *stigmatizing*—information which had the general effect of curtailing her future freedom of choice or action." *Asbill v. Housing Auth. of Choctaw Nation,* 726 F.2d 1499, 1503 (10th Cir.1984). Thus, she has made a showing that she was entitled to notice and a due process hearing to clear her name. *See Roth,* 408 U.S. at 573 n. 12, 92 S.Ct. at 2707 n. 12 ("The purpose of such

notice and hearing is to provide the person an opportunity to clear [her] name.").

▮ The more difficult question is whether plaintiff has raised a question of material fact that defendants denied her that due process hearing. Defendants assert that, as a matter of law, the March 2 meeting provided all the procedural due process to which plaintiff was entitled. We disagree. The publication of the allegedly false and stigmatizing information—that plaintiff "illegally" delivered a baby and lied about it—occurred after the March 2 meeting. Therefore, plaintiff was entitled to a hearing after the publication, which was apparently on March 3, 1992. App. 109–10.

Defendants, however, argue that plaintiff waived any further hearing because she did not file a grievance after the March 2 meeting. Plaintiff responds that defendants discouraged her from filing a grievance, although defendants dispute this. *See* App. 61–62, 92–93, 102, 106–08. Plaintiff stated in her deposition that she actually made an appointment with Evelyn Hartigan to initiate a grievance but was told she had "no grounds for a grievance," *id.* at 107–08, and that defendant Duncan told her that "he had done it [told her story] for [her]." *Id.* at 102. Arguably at this point plaintiff had nothing to grieve because no final decision as to her job status had been made. Defendants had decided and plaintiff agreed—according to a March 23, 1992, letter from the assistant attorney general, *see id.* at 81; *see also* V R. 194, ex. B [5]—to allow the DOPL to conduct an investigation and to let her job status be determined by the result of DOPL's determination on the matter. Presumably, if DOPL declined to take action against plaintiff's nursing license, she would be returned to her job at the Medical Center and as a result her name would be cleared. If, on the other hand, DOPL initiated action to revoke or suspend her nursing license, plaintiff would have the type of hearing (with the right to representation, to present witnesses, etc.) that would satisfy our due process concerns. Thus, although plaintiff did not pursue a grievance procedure with the Medical Center, she agreed to a procedure by a third party state agency to serve the same purpose.

Plaintiff alleges that defendants interfered with the DOPL process. Specifically, she asserts that after the DOPL investigator initially determined plaintiff had not violated nursing practices, some of the defendants contacted DOPL personnel and exerted pressure to change that initial decision.[6] Defendants assert that DOPL initially decided there was a violation justifying a prosecution to terminate her nursing license, but then decided there was not. These disputed issues of material fact cannot be resolved on summary judgment. The outcome of the DOPL investigation may have been prolonged by the fact that plaintiff herself filed this lawsuit before the DOPL made a written report or determination. Further, plaintiff failed to pursue the grievance process at this point. But defendants had agreed to abide by the DOPL decision and then allegedly failed to do so when that decision was favorable to plaintiff.

▮ The question then becomes whether defendants' alleged actions violated a clearly established right of which they should have been aware. We believe they do. If Medical Center officials agreed to follow a specific avenue to resolve the status of plaintiff's employment, and then actively interfered

---

**5.** This exhibit is a letter from plaintiff's attorney to an assistant attorney general stating agreement that plaintiff "will be reinstated with full back pay if her license is not revoked by the nursing board."

**6.** Plaintiff's evidence of the defendants' actions to change the outcome of the DOPL investigation included (1) a letter from defendant Harland to VaLaine Pack, Nursing Consultant to DOPL, stating that the DOPL investigator had informed her that it is not a violation of state regulations for a nurse to deliver a baby "if the doctor tells her she can and is in the room," and that "[w]e at [the Medical Center] strongly disagree with this interpretation," App. 29; (2) a memorandum dated May 28, 1992, by defendant Harland indicating that she and defendants Hartigan and Heard met personally with Pack on May 4, 1992, to discuss and complain of the DOPL's "no violation" finding with respect to plaintiff, IV R. doc. 128, ex. B (Harland deposition ex. 18); and (3) a deposition of the DOPL investigator stating that after the initial decision not to take action against plaintiff's license, but to send an informal reprimand, a meeting was held in May 1992 including Pack, Steed and Robinson at which it was determined that such a letter would not be sent, III R. doc. 102, Godnick deposition.

with that process, they violated plaintiff's right to procedural due process, a right clearly established at the time. *See, e.g., Melton,* 928 F.2d 920. Defendants are not entitled to qualified immunity on plaintiff's liberty claim.

## IV

In summary, we AFFIRM the district court's summary judgment on the Eleventh Amendment immunity, and its grant of qualified immunity to the individual defendants on plaintiff's alleged property interests in continued employment and in her nursing license. We hold, however, that plaintiff has sufficiently met her burden to show that defendants' actions violated her liberty interests in the protection of her reputation and freedom to take advantage of other employment opportunities that summary judgment based on qualified immunity was improper on that issue. We therefore REVERSE that portion of the case and REMAND for further proceedings in accord with this opinion.