**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**MAR 13 2001**

**PATRICK FISHER**
**Clerk**

## UNITED STATES COURT OF APPEALS

## TENTH CIRCUIT

MIKE McCARTY; PAT McCARTY,

Plaintiffs-Appellants,

v.

THE CITY OF BARTLESVILLE;
STEVEN L. BROWN; ROBERT
NEWMAN; TIM SHIVELY,

Defendants-Appellees.

No. 99-5200

(N.D. Oklahoma)

(D.C. No. 98-CIV-181-H)

## ORDER AND JUDGMENT *

Before **KELLY** , **HENRY** , Circuit Judges and **SHADUR** , District Judge. **

Mike McCarty and Pat McCarty, brothers and members of the Bartlesville,

Oklahoma, Police Department, filed suit against the City of Bartlesville and three

members of the Bartlesville Police Department (the "Department") pursuant to 42

---

* This order and judgment is not binding precedent, except under the
doctrines of law of the case, res judicata, and collateral estoppel. The court
generally disfavors the citation of orders and judgments; nevertheless, an order
and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

** The Honorable Milton I. Shadur, United States Senior District Judge for
the Northern District of Illinois, sitting by designation.

U.S.C. § 1983. The McCartys alleged that the termination of their employment as police officers with the Department deprived them of their Fourteenth Amendment right to procedural due process and violated their Fourth Amendment right to be free from unreasonable searches and seizures. The McCartys also brought a federal claim for malicious prosecution. The district court granted the defendants' motion to dismiss the City of Bartlesville. After the defendants sought summary judgment, the McCartys sought to amend their complaint. The district court granted summary judgment to the defendants and denied the McCartys' motion to amend as untimely. The McCartys appeal the grant of summary judgment and the denial of the motion to amend. For the reasons set forth below, we affirm.

I. BACKGROUND

A review of the district court's order and the record reveals the following material facts. These facts are either undisputed or, where disputed, are taken in the light most favorable to the plaintiffs. See Simms v. Oklahoma ex rel. Dep't of Mental Health & Substance Abuse Servs., 165 F.3d 1321, 1326 (10th Cir.), cert. denied, 528 U.S. 815 (1999). Pat McCarty and Mike McCarty joined the Department in 1990. Sometime in 1994, the Brookhaven Plaza Apartments ("Brookhaven") began to hire off-duty Bartlesville police offices to provide

security at the complex. The officers were hired because the complex had only one security officer, David Lea, and the complex had increasing security problems, apparently related to drug trafficking. The McCartys, defendant Sgt. Tim Shively, Officer Brian Helkenberg, and Officer Dan Woolery were among the officers from the Department hired by Brookhaven. Originally, Bartlesville police officers provided security around the clock, but management subsequently reduced the security hours so that security would be provided by the officers from 6:00 p.m. to 6:00 a.m.

Initially, the officers signed up for the Brookhaven work at the Department. After Brookhaven's management scaled back hours, the procedures changed, and the officers contacted Brookhaven management directly regarding scheduling.

Brookhaven's management later reduced the security hours a second time so that the shifts ended at 4:00 a.m. The McCartys were scheduled to work security at Brookhaven on a shift that began at 10:00 p.m. and ended at either 2:00 a.m. or 4:00 a.m. Elaine Lea, spouse of Mr. Lea, the Brookhaven security officer, and a Brookhaven employee herself, was responsible for keeping track of the time officers worked security at the complex for payroll purposes.

In the spring of 1997, Diane Cunningham, the manager of Brookhaven, contacted Pat McCarty to investigate whether Officer Helkenberg was being compensated by Brookhaven as a security officer while not actually performing

such work. During the investigation, Pat McCarty requested and received payroll records of Officer Helkenberg from Ms. Cunningham. He reviewed these records as well as Department records relating to Officer Helkenberg's scheduled work hours.

Pat McCarty concluded that Officer Helkenberg was charging Brookhaven for work he did not perform. He reported this conclusion to his shift commander, Lt. Robert Peugh, who turned the case over to defendant Capt. Robert Newman, the acting Chief of Police in defendant Chief Steven L. Brown's absence. Pat McCarty objected to Lt. Peugh's turning the case over to Capt. Newman, fearing that it would lead to an investigation of his own conduct. See Aplts' App. vol. II, at 585 (deposition testimony of Pat McCarty).

Capt. Newman decided to conduct personally an investigation into Officer Helkenberg's conduct. He reviewed Officer Helkenberg's records and interviewed Ms. Cunningham and the Leas during his investigation. Capt. Newman thereafter suspended Officer Helkenberg and prepared a report for Chief Brown. Chief Brown directed Capt. Newman to assign the investigation to Sgt. Shively.

Sgt. Shively interviewed Officer Helkenberg for information. Apparently, the Leas told Officer Helkenberg that they sometimes paid Pat McCarty for time that Pat McCarty did not work. Sgt. Shively then expanded the investigation to

-4-

include other officers, including the McCartys. Capt. Newman knew that Sgt. Shively had negative feelings toward the McCartys due to past professional conflicts. Sgt. Shively acknowledged the presence of negative feelings during his discovery deposition.

As part of the expanded investigation, Sgt. Shively contacted Paul Scruggs, an owner of Oklahoma Property Management, Inc., the managing entity for Brookhaven. Mr. Scruggs voluntarily delivered time records to Sgt. Shively. Sgt. Shively also reviewed timesheets from the Department.

Sgt. Shively's timesheet review indicated that, on twenty-one different dates, Mike McCarty had double-billed a total of 42.75 hours of work over a two-year time period and that, on nineteen different dates, Pat McCarty had double-billed a total of 36.25 hours over a similar period. Sgt. Shively also concluded that Officer Woolery had double-billed on three different dates.

On April 23, 1997, Sgt. Shively interviewed Officer Woolery about the billing discrepancies. Officer Woolery was ultimately allowed the opportunity to rectify the situation by making restitution to Brookhaven and writing a letter of apology. Sgt. Shively did not interview either of the McCartys or give them a chance to explain the billing discrepancies.

On or about April 24, 1997, the City served notices upon Mike and Pat McCarty, requiring each to appear for disciplinary hearings on April 28 and April

29, 1997, respectively. At those hearings, Mike and Pat McCarty explained that the apartment complex often filled out the timesheets in advance and that all time billed was later made up.

On April 29, Sgt. Shively, who had attended the disciplinary hearings, conducted a follow-up interview of the Leas. Elaine Lea told Sgt. Shively that she kept the timesheets for Brookhaven; that, on occasion, officers signed partially completed timesheets; and that it was possible that officers signed blank timesheets. She also informed Sgt. Shively that she worked with officers to help them make up previously billed time and that she kept no record of made-up time.

Sgt. Shively sent Washington County District Attorney Rick Esser a copy of the report of his investigation surrounding the alleged Brookhaven overpayments. After reviewing the report, the district attorney determined there was probable cause to support the charges suggested in Sgt. Shively's report. On May 12, 1997, D.A. Esser submitted Deferred Prosecution Agreements to the McCartys, which they refused to sign. As a result, on May 15, 1997, the McCartys were arrested and charged with obtaining money by false pretenses. Chief Brown signed the termination letters that discharged the McCartys from their positions as police officers, effective May 15, 1997.

On July 3, 1997, the Washington County Court held a preliminary hearing as to the criminal charges and found there was probable cause for the McCartys to

be bound over for trial. On September 17, 1997, the Washington County Court held another hearing. The prosecution had been unable to authenticate the Brookhaven timecards and the McCartys' attorney moved to dismiss the charges based on the court's exclusion of various Brookhaven time records. The court granted the motion, and the charges against the McCartys were dismissed. On or about October 3, 1997, the City reinstated the McCartys with full backpay.

The McCartys filed this § 1983 action before the district court alleging (1) deprivation of their liberty interests in violation of their due process rights, (2) violation of their Fourth Amendment right to be free from unreasonable searches and seizures, and (3) malicious prosecution. The district court granted the defendants' motion to dismiss the City. The McCartys do not appeal this ruling. After the defendants sought summary judgment, the McCartys sought to add another claim to their complaint. They now appeal the district court's grant of summary judgment to the defendants and the district court's denial of their motion to amend their complaint.

## II. DISCUSSION

### A. Standard of Review

"We review the district court's legal conclusions de novo and its findings of fact for clear error." McClure v. Independent Sch. Dist. No. 16, 228 F.3d

1205, 1212 (10th Cir. 2000). We "apply[] the same legal standard used by the district court under Fed. R. Civ. P. 56(c)." Simms, 165 F.3d at 1326. Summary judgment is appropriate where "where there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). When reviewing a grant of summary judgment, "we view the evidence and draw reasonable inferences therefrom in the light most favorable to the nonmoving party." See Simms, 165 F.3d at 1326.

The individual defendants also raise qualified immunity as a defense. Because we determine that no constitutional right was violated, we need not discuss the qualified immunity issue. See Taylor v. Meacham, 82 F.3d 1556, 1564 (10th Cir. 1996) ("conclud[ing] that, [because] no constitutional right was violated, . . . we proceed no further on the qualified immunity issue") (citation omitted).

**B. Due Process Claims**

The McCartys contend that the defendants deprived them of a liberty interest through the filing of criminal charges against them and through the publication of various false and damaging documents, specifically, the criminal informations, a press release, and related media reports. We have held that "[i]ndividual liability under § 1983 must be based on personal involvement in the alleged constitutional violation." Foote v. Spiegel, 118 F.3d 1416, 1423 (10th

Cir. 1997). The McCartys' amended complaint does not specifically allege the personal involvement of each defendant, but it is not so vague so as to deserve dismissal. The McCartys allege that each of the following persons contributed to the constitutional violations:

1. Capt. Newman, filling in as Acting Chief, assigned the initial investigation of Officer Helkenberg to Sgt. Shively;

2. Chief Brown and Capt. Newman were aware of the negative feelings between Officer Shively and the McCartys;

3. Chief Brown and Capt. Newman signed the McCartys' notices of pre-termination hearings;

4. Chief Brown and Capt. Newman instructed Officer Shively to interview the Leas on April 29, 1997, after the pre-termination hearings;

5. Chief Brown and Capt. Newman knew about and consented to the falsifications in Officer Shively's report, specifically, that the McCartys received money by false pretenses;

6. Chief Brown, Capt. Newman, and Officer Shively met with D.A. Esser and provided him with the falsified report;

7. Chief Brown signed the McCartys' termination letters; and

8. At all times, Chief Brown was acting under the color of state law.

In response, the defendants dispute that: (1) there were false statements made during the course of the McCartys' termination; and (2) the McCartys were deprived of due process, for they received a name-clearing pre-termination hearing. The defendants also argue that they are entitled to qualified immunity.

In order to prevail on a § 1983 claim, a plaintiff must establish that the defendants acted under color of state law and that the defendants' actions deprived the plaintiff of some federal right. See Sutton v. Utah State Sch. for the Deaf & Blind, 173 F.3d 1226, 1237 (10th Cir. 1999). We have clearly articulated the four-part test a plaintiff must satisfy to demonstrate the deprivation of a liberty interest in one's good name and reputation:

> First, to be actionable, the statements must impugn the good name, reputation, honor, or integrity of the employee. Second, the statements must be false. Third, the statements must occur in the course of terminating the employee or must foreclose other employment opportunities. And fourth, the statements must be published.

Workman v. Jordan, 32 F.3d 475, 481 (10th Cir. 1994) (citations omitted); see also Melton v. City of Oklahoma City, 928 F.2d 920, 926-27 (10th Cir. 1991) (en

-10-

banc) (emphasizing that elements are not disjunctive and all must be satisfied). If all of the above elements are established, "the Due Process Clause requires an adequate name-clearing hearing." Tonkovich v. Kansas Bd. of Regents, 159 F.3d 504, 526 (10th Cir. 1998). For a variety of reasons, we hold that the McCartys fail to demonstrate the deprivation of a liberty interest.

1. The statements were not made public and were not false.

The McCartys rely on Watson v. University of Utah Medical Center, 75 F.3d 569 (10th Cir. 1996), in support of their claim that the criminal informations and/or media reports were made public by the defendants, specifically by Chief Brown through discussions with D.A. Esser. In Watson, the plaintiff was employed as a nurse at the University of Utah Medical Center. She "produced evidence that her supervisors made public statements to the entire nursing staff not only that she had 'illegally' delivered a baby but also that she lied about the incident." Id. at 579. The court did not consider whether these charge were published, but did immediately conclude that the "public charges certainly impugn[ed] [the plaintiff's] honesty and integrity." Id.

a. The criminal informations

-11-

As to the criminal informations, the McCartys analogize the Watson case's "public statements to the entire nursing staff" to Chief Brown's discussion of the case with the district attorney for Washington County. We have held that "such intra-government dissemination, by itself, falls short of the Supreme Court's notion of publication: 'to be made public.'" Asbill v. Housing Auth. of Choctaw Nation of Okla., 726 F.2d 1499, 1503 (10th Cir. 1984) (quoting Bishop v. Wood, 426 U.S. 341, 348 (1976)); see also Harris v. Blake, 798 F.2d 419, 422 n.2 (10th Cir. 1986) (relying on Asbill in concluding that letter not published where student alleged § 1983 claim regarding his forced withdrawal from psychology program based in part on dissemination of letter to some college instructors and personnel). In addition, the McCartys do not contest that the criminal informations signed by D.A. Esser and supported by a statement signed by Officer Shively were "absolutely privileged document[s]" because they were public court documents. Primas v. City of Oklahoma City, 958 F.2d 1506, 1510 (10th Cir. 1992). The McCartys offer no other basis for finding publication of the criminal informations.

### b. The media reports

The McCartys' proffer of evidence in support of its contention that the defendants provided information to the media is similarly unsupported. The

-12-

McCartys assert that, because D.A. Esser discussed and asked for Chief Brown's input regarding the contents of a press release regarding the investigation, somehow the press release's issuance can be traced to Chief Brown. Chief Brown offered unrebutted testimony that, although his suggestions as to the contents of the press release were solicited by D.A. Esser, he offered none. See Aplts' App. vol. IV, at 1170 (deposition testimony of Chief Brown).

In addition, the press release merely discussed the charging of the McCartys with obtaining money by false pretenses, which was correct. Aplts' App. vol. IV, at 1173 (press release dated May 15, 1997). The press release also stated that the McCartys were being suspended with pay pending administrative hearings and the outcome of legal proceedings, which was also accurate. See also Primas, 958 F.2d at 1510 (stating that "criminal complaint was an absolutely privileged document" and that any defamation stemmed from that public court document, not from statements made to news reporter); cf. Codd v. Velger, 429 U.S. 624, 626-27 (1977) (holding that former police officer failed to affirmatively assert "that the report of the apparent suicide attempt was substantially false" and, as a result, failed to satisfy the final necessary element needed to make out a claim of stigmatization); Fraternal Order of Police, Lodge No. 5 v. Tucker, 868 F.2d 74, 82 (3d Cir. 1989) (holding, "as in Codd, there is neither a finding nor

evidence at trial to support a finding that the press release was false or even misleading").

In sum, Chief Brown had no connection with the issuance of the press release and the press release contained only true statements. In addition, the McCartys cannot establish that the press release was made in the course of termination. In this regard, although the press release and subsequent media reports may have been a motivating factor in the discharge of the McCartys, "[t]he record contains no evidence from which a reasonable jury could conclude that any allegedly false statements made in Sgt. Shively's investigation report or the criminal charges were made in the course of the termination of Plaintiffs." Aplts' App. vol. IV, at 1187 (Dist. Ct. Order, filed Aug. 30, 1999); see also Bishop, 426 U.S. at 348 (noting that statements made no "public disclosure of the *reasons* for the discharge") (emphasis added); Melton, 928 F.2d at 928-29 (noting that city did not violate police officer's liberty interest when spokesperson accurately told the press that the department was investigating perjury allegations against the officer and that the police department's statements were not false).

2. The McCartys received due process.

Finally, the McCartys do not dispute that they received an adequate name-clearing pre-termination hearing. Similarly, they do not contend that they were

-14-

entitled to further name-clearing proceedings.    See e.g. , Tonkovich , 159 F.3d at 526 (noting that accusations of rape may have infringed upon professor's liberty interest, but concluding that the defendant "University provided him with an adequate name-clearing hearing").

We note that in general the filing of charges likely inflicts some damage to one's reputation but that, in this case, no constitutionally protected property interest was infringed.    Although the McCartys may succeed on tort claims based on violations of state law, there is no constitutional violation here.    See Paul v. Davis , 424 U.S. 693, 709 (1976) (stating that it is not "sufficient to establish a claim under § 1983 and the Fourteenth Amendment that there simply be defamation by a state official; the defamation had to occur in the course of the termination of employment");    Tonkovich , 159 F.3d at 526-27 (noting that plaintiff "may or may not have valid claims based on violations of state law" but that he failed to demonstrate a federal procedural or substantive due process claim); Lancaster v. Independent Sch. Dist. No. 5   , 149 F.3d 1228, 1235 (10th Cir. 1998) ("While the injury to reputation asserted by the plaintiff may be actionable under state tort law, it falls far short of a constitutional violation.") (footnote omitted) .

3.  <u>There was no deprivation of a liberty interest</u>.

Lastly, the McCartys are unable to establish that an actual deprivation occurred.  The McCartys were discharged but subsequently rehired with full backpay and benefits.  We acknowledge that their rehire does not mean that they will be welcomed without reservation by their colleagues and superiors, but the loss of prospective job opportunities is too speculative to support a deprivation of a liberty interest claim under § 1983.    <u>See</u> <u>Phelps v. Wichita Eagle-Beacon</u>, 886 F.2d 1262, 1269 (10th Cir. 1989) ("[D]amage to 'prospective employment opportunities' is too intangible to constitute a deprivation of a liberty or property interest.");  <u>see also</u> <u>Jensen v. Redevelopment Agency of Sandy City</u>, 998 F.2d 1550, 1559 (10th Cir. 1993) (noting the same).  The McCartys' liberty interest claim necessarily fails.


**C.  Fourth Amendment Claims**

Next, the McCartys contend that the  defendants unconstitutionally violated their Fourth Amendment right to be free from unreasonable search and seizure based on Sgt. Shively's possession and examination of the employee time records from Oklahoma Property Management Company and from the Department.  It appears that the McCartys contend that Capt. Brown, in his capacity as Acting Chief of Police, assigned Officer Shively to the investigation and thus consented

-16-

to the unlawful search and seizure.  The district court concluded that the McCartys lacked standing to assert this claim because they had no objectively reasonable expectation of privacy in the items searched.  We agree.

"Whether a defendant has standing to challenge a search is a legal question subject to de novo review."    United States v. Shareef  , 100 F.3d 1491, 1499 (10th Cir. 1996).  The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S. Const. amend. IV.

A person must have "a legitimate expectation of privacy in the invaded place" to demonstrate Fourth Amendment protection in property.        Rakas v. Illinois , 439 U.S. 128, 143 (1978).  "Determining whether a legitimate or justifiable expectation of privacy exists . . . involves two inquiries."        United States v. Leary  , 846 F.2d 592, 595 (10th Cir. 1988).   First, the person "must show a subjective expectation of privacy in the area searched, and second, that expectation must be one that 'society is prepared to recognize as "reasonable."'" Id. (quoting  Hudson v. Palmer  , 468 U.S. 517, 525 (1984)).

1. Brookhaven timesheets

To assess the reasonableness of the McCartys' expectations, we consider ownership, lawful possession, and lawful control of the place searched.        See

United States v. Abreu, 935 F.2d 1130, 1133 (10th Cir. 1991).  As to the Brookhaven documents, the record does not contain any substantial evidence that the McCartys had a reasonable expectation of privacy in these timesheets.  The McCartys claim Sgt. Shively examined the Department records without probable cause and with, at best, a "hunch."  Aplts' Br. at 42.  The McCartys aver that, as former employees of a company, they have "a reasonable expectation that their payroll records [will not] be disseminated to strangers."  Id. at 42.

The McCartys do not address the obvious inconsistencies in their positions.  When Pat McCarty investigated Officer Helkenberg and his hours worked at Brookhaven, he similarly requested and reviewed for discrepancies Officer Helkenberg's Brookhaven timesheets.  In addition,  Mr. Scruggs, who had access to and control of Brookhaven's business records, consented to disclose the McCartys' records to Sgt. Shively.  The McCartys do not purport to control and in fact had no ability to control the Brookhaven documents or exclude others from gaining access to the documents.   See Rakas, 439 U.S. at 143 n.12 (noting retention of property concepts in Fourth Amendment jurisprudence and stating that "[o]ne of the main rights attaching to property is the right to exclude others, and one who owns or lawfully possesses or controls property will in all likelihood have a legitimate expectation of privacy by virtue of this right to exclude") (citation omitted). Viewed objectively, the evidence is insufficient to establish a

reasonable expectation of privacy in the Brookhaven timesheets, and, as such, we conclude that the McCartys lack standing to challenge their search or seizure.

2. Department records

As to the McCartys' ability to assert standing to challenge the seizure of the Department records, they fare no better. The record indicates that all Department employees may review any other employee's time records during the two-week time period in which the records are available for correction and verification. After the timesheets are filed, "all officers of the rank of Sergeant or higher have keys to the file cabinet in which the [employees'] Timesheets are kept." Aplts' App. vol. I, at 246 (Aff. of Theresa Hampton, Administrative Ass't for the Department, dated Dec. 10, 1998).

It is unquestioned that there is a "diminished expectation of privacy in the workplace." Medical Lab. Mgmt. Consultant v. American Broadcasting Cos., 30 F. Supp. 2d 1182, 1188 (D. Ariz. 1998) (citing various cases); see also United States v. Anderson, 154 F.3d 1225, 1230 (10th Cir. 1998) (recognizing difficulty of establishing standing to challenge certain workplace searches). In addition, the operational realities and practices of the Department augmented the McCartys' diminished expectation of privacy in their payroll records, which were initially available for inspection by all members of the Department. See National Treasury

-19-

Employees Union v. Von Raab, 489 U.S. 656, 671 (1989) (noting that "operational realities" may "diminish privacy expectations" in the workplace); O'Connor v. Ortega, 480 U.S. 709, 717 (1987); American Federation of Gov't Employees, AFL-CIO v. Skinner, 885 F.2d 884, 893 (D.C. Cir. 1989) (relying on O'Connor and holding that urinalysis testing of Department of Transportation employees was reasonable); National Fed'n of Fed. Employees v. Cheney, 884 F.2d 603, 613 (D.C. Cir. 1989) (concluding that operational realities of civilian guards' workplace made random urinalysis testing reasonable).

After the timesheets were verified, the Department's procedures provided that the records could be viewed by an officer of the rank of Sgt. or higher. Cf. United States v. Simons, 206 F.3d 392, 399 (4th Cir. 2000) (noting that "the operational realities of [defendant's] workplace may have diminished his legitimate privacy expectations," but concluding that "there is no evidence in the record of any workplace practices, procedures, or regulations that had such an effect"); see also Cox v. Hatch, 761 P.2d 556, 563 (Utah 1988) (holding that there was no reasonable expectation of privacy in a "common workplace where there were a number of other people"); Hastings & Sons Publ'g Co. v. City Treasurer, 375 N.E.2d 299, 303 (Mass. 1978) (holding that there was no breach of privacy in disclosure of payroll records because information did not include "'intimate details' of a 'highly personal' nature").

We have stated that "in determining whether an employee has standing to challenge seizure of an item from the workplace, . . . we will consider all of the relevant circumstances, including (1) the employee's relationship to the item seized; (2) whether the item was in the immediate control of the employee when it was seized; and (3) whether the employee took actions to maintain his privacy in the item."  Anderson , 154 F.3d at 1232.  Quite simply, the McCartys cannot claim ownership of the records; they did not immediately or indirectly control the areas where the files were maintained; and they do not contend that they did or were able to take any action to maintain their privacy in the records. [1]  Thus, the McCartys lack standing to challenge the search and seizure of the Department records.

### D.  Malicious Prosecution

The McCartys next contend that the district court erred when it granted the defendants summary judgment on their claim for malicious prosecution under 42

---

[1]  We note that the McCartys also claim state law, see Okla. Stat. Ann. tit. 40, § 61 and tit. 51, § 24A.7, somehow confers standing on them to challenge the seizure of the Brookhaven and Department records.  Without expending unnecessary discussion on this argument, we note that we agree with the district court that "nothing in the specific statutory language or statutory scheme of these provisions suggests that these provisions would apply to the instant case or, assuming their relevance, would support the expansive reading Plaintiffs would urge the Court to adopt."  Aplts' App. vol. IV, at 1190 (Dist. Ct. Order, filed Aug. 30, 1999).

U.S.C. § 1983. See Taylor v. Meacham, 82 F.3d 1556, 1561 (10th Cir. 1996) (concluding "that our circuit takes the common law elements of malicious prosecution as the 'starting point' for the analysis of a § 1983 malicious prosecution claim, but always reaches the ultimate question, which it must, of whether the plaintiff has proven a *constitutional* violation"). In order to establish a malicious prosecution claim under § 1983, the plaintiff must also prove a Fourth Amendment constitutional violation. See id. The McCartys contend that there was no probable cause to support the filing of criminal charges against them: Sgt. Shively knew this when he presented D.A. Esser with his report and Chief Brown knew this when he met with D.A. Esser to discuss the report.

Under Oklahoma state tort law, the elements of the tort of malicious prosecution are: "(1) the bringing of the original action by the defendant; (2) its successful termination in favor of the plaintiff; (3) want of probable cause to bring the action; (4) malice; and (5) damages." Parker v. City of Midwest City, 850 P.2d 1065, 1067 (Okla. 1993). Failure to establish any one of those elements defeats an action for malicious prosecution. See id.

The district court determined that the McCartys could not establish that the criminal charges filed against them in Washington County were brought without probable cause. Specifically, the district court noted three separate instances in which probable cause was demonstrated: (1) at the close of the preliminary

-22-

hearing; (2) as a result of D.A. Esser's independent review of the case; and (3) at the September 17, 1997, hearing during which counsel for the McCartys admitted there was probable cause to file the charges. We agree that the McCartys are unable to show a want of probable cause and affirm the district court's grant of summary judgment on this issue.

The McCartys' argument revolves around the report prepared by Sgt. Shively. Sgt. Shively's report chronicled and compared the McCartys' timesheets from the Department with those from Brookhaven. The Brookhaven timesheets were deemed to be unreliable by the reviewing judge, in part because Ms. Lea, who prepared the reports, could not vouch for their accuracy. The McCartys argue that the unreliability of the Brookhaven reports undermines Sgt. Shively's determination of probable cause. Because the preliminary hearing judge and D.A. Esser relied upon Sgt. Shively's questionable report, the McCartys contend that the determination of probable cause is erroneous.

In addition, the McCartys dispute the district court's apparent reliance upon D.A. Esser's affidavit, which detailed his independent review of Sgt. Shively's report and the his decision to file criminal charges against the McCartys.      See Aplts' Br. at 45-46 (citing    Powell v. LeForce  , 848 P.2d 17 (Okla. 1992);    Page v. Rose, 546 P.2d 617 (Okla. 1975)). They state that under Oklahoma law, where

the evidence is conflicting regarding the finding of probable cause, the issue is proper to place before a jury.

The defendants counter that the standard of proof needed for probable cause is significantly lower than that needed for conviction. They contend that D.A. Esser was justified when he filed the charges in part because the report indicated there was "a substantial probability that a crime ha[d] been committed and that a specific individual [had] committed the crime." Taylor, 82 F.3d at 1562 (internal quotation marks omitted). They also argue that the preliminary hearing judge's finding of probable cause and the McCartys' counsel's admission of probable cause defeats their argument.

We agree with the defendants. D.A. Esser's determination that there was probable cause is well supported. The conclusion that multiple inconsistencies between Department and Brookhaven logs, in conjunction with the findings from the interview of the Leas, were sufficient indicia of the commission of a crime was not unreasonable.

At the preliminary hearing, the McCartys presented evidence and cross-examined witnesses. As a result of the hearing, the judge made an independent assessment of probable cause when it overruled the McCartys' motion for a demurrer. See Aplts' App. vol. I, at 317 (Tr. of Prelim. Hr'g, dated July 3, 1997). This conclusion is also evidence of probable cause.

Finally, the McCartys are left with their counsel's forthright and unchallenged admission that there was probable cause to support the filing of the charges. Specifically, counsel stated that, as to filing of the charges, the surmise of probable cause based upon the comparison of the Department and Brookhaven timesheets was "very reasonable." Id. at 322 (Tr. of Mot. to Dismiss Hr'g, dated Sept. 17, 1997). In addition, the McCartys' counsel stated, "I find no fault in the state attorney's office . . . at any point in the litigation" as to their filing of the charges. Id. at 322-23.

We note that Sgt. Shively separately interviewed Officer Woolery regarding his timesheet discrepancies and that the McCartys were not given such an opportunity. In the end, Officer Woolery was allowed to make restitution and write a letter to Brookhaven apologizing for his alleged and apparent timesheet oversights, which amounted to three discrete discrepancies. Sgt. Shively and Chief Brown believed Officer Woolery's explanation of the oversights and his concomitant belief that he had already worked to make up for this time.

Upon review of the record, we cannot determine that the presence of animosity between Sgt. Shively and the McCartys contributed to the divergent investigations or to any manufacture of probable cause. In addition, we note that Sgt. Shively's report indicated that each of the McCartys had over a dozen alleged infractions. The record indicates that the McCartys were aware that they had

-25-

received money for hours that they had not worked, whether they intended to make up the time or not. Given the apparent disparate treatment however, we are reluctant to condone the Department's assignment process where internal investigations of colleagues are handed to potentially vindictive superior officers. However, we also cannot say that any ill will tainted the investigative process that would amount to a constitutional violation in this case. We hold that the district court properly granted summary judgment on the malicious prosecution claim to the defendants.

### E. Motion to Amend the Complaint

Finally, the McCartys also contend that the district court abused its discretion when it refused to allow them to amend their complaint, nearly nine months after they filed their initial complaint, and after summary judgment motions were pending before the district court. The district court noted it was dismissing the amendment as untimely, "given the history of this case." Aplts' App. vol. IV, at 1184 (Dist. Ct. Order, filed Aug. 30, 1999). We review the district court's denial of a motion to amend a complaint for an abuse of discretion. See Lambertsen v. Utah Dep't of Corrections, 79 F.3d 1024, 1029 (10th Cir. 1996).

Federal Rule of Civil Procedure 15(a) provides "leave [to amend] shall be freely given when justice so requires." Fed. R. Civ. P. 15(a). The McCartys offered no new facts in their motion to amend but rather sought to allow the inclusion of § 1983 claim pursuant to Garrity v. New Jersey, 385 U.S. 493, 500 (1967). In Garrity, the Supreme Court prohibited the "use in subsequent criminal proceedings of statements obtained under threat of removal from office, and [held] that it extends to all, whether they are policemen or other members of our body politic." Id. at 500. Garrity's protection, therefore, acts to immunize these compelled statements, as it prohibits their subsequent use against the officer so as not to offend the Fifth Amendment privilege." In re Grand Jury Subpoenas v. United States, 40 F.3d 1096, 1102-03 (10th Cir. 1994).

Specifically, the McCartys claim that Sgt. Shively, after attending the disciplinary proceedings, was directed to follow up on his criminal investigation using information derived from the McCartys at the hearings. Sgt. Shively's attendance and involvement throughout the criminal investigation has served as the linchpin of the McCartys' case, and for the McCartys to claim that they were unaware of his activities until discovery was nearly complete appears insincere. In addition, our independent review of the record shows that the district court's decision not to allow plaintiff to amend their complaint was well within its discretion.

## III. CONCLUSION

For the reasons set forth above, we AFFIRM the district court's grant of summary judgment to defendants on all claims, and we AFFIRM the district court's decision denying the McCartys' motion to amend their complaint.

Entered for the Court,

Robert H. Henry
Circuit Judge